594 A.2d 172
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v. RICHARD BIEGENWALD, DEFENDANT-
APPELLANT.

Argued September 11, 1990—Decided August 8, 1991.

1

3

*James J. Smith, Jr.,* Deputy Public Defender, and *Stephen A. Caruso,* Assistant Deputy Public Defender, argued the cause for appellant (*Wilfredo Caraballo,* Public Defender, attorney).

*Mark P. Stalford,* Assistant Prosecutor, argued the cause for respondent (*John Kaye,* Monmouth County Prosecutor, attorney).

*Cherrie Madden Black,* Deputy Attorney General, argued the cause for *amicus curiae,* Attorney General of New Jersey (*Robert J. Del Tufo,* Attorney General, attorney).

The judgment of the Court was delivered by

CLIFFORD, J.

In *State v. Biegenwald,* 106 *N.J.* 13, 524 *A.*2d 130 (1987) (*Biegenwald* II), we affirmed Richard Biegenwald's conviction

for the murder of Anna Olesiewicz but reversed his sentence of death and remanded the case for a new sentencing proceeding. A second jury having returned a death-penalty verdict, the trial court sentenced defendant to death. Defendant appeals directly to this Court as of right. *R.* 2:2–1(a)(3). Because the death-qualification process of the *voir dire* was inadequate to ensure defendant's constitutional right to trial by a "fair and impartial jury" and therefore in conflict with the principles set forth in this Court's opinion in *State v. Williams,* 113 *N.J.* 393, 408–27, 550 *A.*2d 1172 (1988) (*Williams* II), we vacate defendant's sentence and remand.

We believe some preliminary observations appropriate. The fundamental goal in jury selection is to make certain each juror will be willing and able to follow—to obey—the court's instructions. As applied in this case that principle requires that each juror be willing and able to consider and weigh all of the evidence on aggravating and mitigating factors before reaching his or her conclusions. Defendant has killed twice before and has been convicted of other murders twice before. We are not sure, under those circumstances, how many people could fairly sit on a jury in this case. The law, however, requires jurors who would at least listen to the evidence of mitigating factors and who would conscientiously weigh that evidence in deciding the appropriate punishment. A fairly chosen jury might conclude, either unanimously or by split vote, that life imprisonment should be the punishment. In fact, a jury did so once before in another murder prosecution against this defendant.

Despite our clear directions in *Williams* II, and despite the prosecution's agreement with defendant's position, the trial court would not allow Biegenwald's counsel to ask the simple question whether the potential juror, knowing that this defendant had previously committed two murders, would be able to consider any other evidence, or whether those facts would result in an automatic death-penalty vote by that juror. The trial court's complex justification for its refusal masks the simplicity of the question's purpose: to find out if the juror

would automatically impose the death penalty, as many would, regardless of the court's instructions on other evidence, once he or she knew of those other murders.

Among the rights that Biegenwald shares with every capital-murder defendant is the right to be executed only after a verdict of a jury that has considered all of the evidence. We do not know if he was accorded that right.

We do not seek a jury that will be one whit less revulsed than the rest of us are by this serial senseless murderer. We insist only that the jury be able, no matter how severe its reaction to the aggravating factors, at least to *consider* the mitigating factors and weigh them in accordance with the court's instructions. Today's decision rests on a proposition that is at once simple and at the very heart of our criminal-justice system: even this multiple murderer is entitled to a fair trial, one that includes a jury-selection process that ensures that the jury will decide his fate according to law.

I

## FACTS AND PROCEDURAL HISTORY

The facts and prior procedural history of this case are fully set forth in *Biegenwald* II, *supra*, 106 *N.J.* at 18–25, 524 *A.*2d 130, and *State v. Biegenwald*, 110 *N.J.* 521, 525–27, 542 *A.*2d 442 (1988) (*Biegenwald* III). Thus we limit our recitation to the facts and history relevant to this appeal.

On August 27, 1982, eighteen-year-old Anna Olesiewicz and a friend, Denise Hunter, drove from Camden to the Asbury Park area. While at the Asbury Park boardwalk, Hunter left Olesiewicz to use a bathroom. When Hunter returned, she was unable to find Olesiewicz and eventually proceeded alone to her uncle's home in Neptune City. The following morning, not having heard from Olesiewicz, Hunter filed a missing-person report.

On January 14, 1983, a skeleton later identified as that of Anna Olesiewicz was discovered in a vacant lot in Ocean Township. There were four bullet holes in the skull. Testimony at the guilt-phase trial indicated that the bullet wounds had been the cause of death. The tissue that remained was inadequate for purposes of blood-alcohol or chemical tests.

One week after the skeleton was discovered, Theresa Smith disclosed to the police that Biegenwald was involved in the shooting. Smith had lived with Biegenwald and his wife, Diane, from June through October 1982 in a multi-apartment building in Asbury Park. Smith reported that she and defendant had become friendly and that she had become defendant's protege. Defendant had encouraged her to find and kill a victim to prove her toughness. On the night of Olesiewicz's disappearance, Smith had been driving around shore towns with a co-worker, whom she had planned to kill in keeping with a scheme she had formulated with Biegenwald. Fortunately for her co-worker, Smith lost her resolve, informed defendant by telephone that she could not proceed as arranged, and returned to the Biegenwald apartment to sleep.

Smith claimed that Biegenwald had awakened her that night for reasons she could not recall. Before returning to sleep Smith looked out a window and saw a "shadow of a body" sitting in the car that Biegenwald had given to her. As recounted in *Biegenwald* II,

> [a]t the end of the next day Biegenwald took Smith into the garage where he lifted a mattress to show Smith a female body in unzipped jeans, a dark shirt and no shoes. Smith did not see the face because a large green plastic bag covered the head and was secured around the neck. Biegenwald asked Smith to touch the body—to "pick her leg up" and tell him how it felt. The defendant told Smith he had shot the victim in the head after meeting her on the boardwalk, telling her he had marijuana, and taking her back to the house. Biegenwald told Smith that Olesiewicz had been intended to be Smith's first victim, but when he had tried to waken Smith while the victim was still alive, Smith would not get up. [106 *N.J.* at 19, 524 *A.*2d 130.]

According to Smith, Biegenwald removed from the victim's finger a black and gold ring and later gave it to Smith. The next day Biegenwald and Dherran Fitzgerald, a tenant in the

same building, disposed of the body in the vacant lot in Ocean Township.

On the basis of Smith's statement, the police arrested Biegenwald, his wife, Diane, and Fitzgerald. They found the murder weapon in Fitzgerald's apartment. The only ammunition found in the house that fit the murder weapon was located in a bag near the basement room in which Biegenwald slept. The black and gold ring—later identified as having belonged to Olesiewicz—was discovered in Diane's jewelry box.

A jury found Biegenwald guilty of knowing and purposeful murder and sentenced him to death. This Court affirmed defendant's guilt-phase conviction but reversed the sentence because of an erroneous charge to the jury concerning the weighing of aggravating and mitigating factors. 106 *N.J.* at 18, 524 *A.*2d 130. We remanded for a new sentencing proceeding. *Ibid.*

In advance of the new proceeding, the court denied a motion of one of defendant's attorneys to be relieved as counsel. The court likewise denied the State's motion for an order allowing Biegenwald's conviction for the murder of William Ward to be admitted as additional evidence of an aggravating factor, but this Court ultimately granted that request. (*Biegenwald III, supra,* 110 *N.J.* 521, 542 *A.*2d 442 (distinguishing *State v. Biegenwald,* 96 *N.J.* 630, 477 *A.*2d 318 (*Biegenwald I*), clarified, 97 *N.J.* 666, 483 *A.*2d 184 (1984)), based on an interim amendment of the murder statute and different status of the conviction at the time of its intended use). Finally, defendant moved to charge the jury separately on six proffered bases for establishing the catch-all mitigating factor, see *N.J.S.A.* 2C:11–3c(5)(h), essentially requesting that the jury be told to consider each basis for applying that factor as an independent mitigating factor. The court denied that motion as well.

Jury selection commenced on January 17, 1989, and lasted three days. On the first day, the trial court delivered a general orientation to prospective jurors. Following hardship excusals,

a pool of eighty-eight venirepersons remained. The court told
the members of the venire about the Biegenwald resentencing
proceeding, informing them that Biegenwald had been convict-
ed of murder and that the Legislature had designed a system
under which the sentence for a capital-murder defendant is
determined in a separate proceeding from that for the determi-
nation of guilt. It explained that the proceeding for which they
were being considered as jurors was solely for the purpose of
sentencing. The court described in general terms the function
of aggravating and mitigating factors and the process for
weighing those factors. It also informed the prospective jurors
of the limited options for sentencing, and instructed them
several times to avoid discussing the case or viewing or reading
media reports concerning it.

Before proceeding to individual *voir dire*, the court had
prospective jurors complete a questionnaire that included ques-
tions concerning prior knowledge of or contact with defendant,
the anticipated witnesses, the attorneys, and knowledge of a
murder case involving defendant. The questionnaire did not
inquire about the venireperson's views on the death penalty.

Individual *voir dire* commenced with the court asking ques-
tions based on the venireperson's responses to the question-
naire and concerning his or her views on the death penalty,
ability to weigh the evidence in support of aggravating and
mitigating factors, and exposure to media coverage. After the
initial questioning, counsel were permitted to pursue, mostly
through the court, further matters raised by a prospective
juror's responses. Individual *voir dire* included questioning of
sixty-four jurors. The court excused twenty-six venirepersons
for cause—eleven based on their knowledge of Biegenwald's
criminal conduct—and released three because the panel was
complete. Defense counsel exercised thirteen peremptory chal-
lenges and the prosecutor exercised eight. Neither party ex-
hausted its allotment.

The evidentiary phase of the sentencing proceeding lasted less than a full day. The State sought to prove two aggravating factors: that defendant had been convicted of another murder, *N.J.S.A.* 2C:11–3c(4)(a), and that the murder was "outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated assault to the victim," *N.J.S.A.* 2C:11–3c(4)(c). Defendant attempted to establish the existence of three mitigating factors: that "defendant was under the influence of extreme mental or emotional disturbance insufficient to constitute a defense to prosecution," *N.J.S.A.* 2C:11–3c(5)(a); that "defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was significantly impaired as the result of mental disease or defect or intoxication, but not to a degree sufficient to constitute a defense to prosecution," *N.J.S.A.* 2C:11–3c(5)(d); and the catch-all factor, *N.J.S.A.* 2C:11–3c(5)(h) ("Any other factor which is relevant to the defendant's character or record or to the circumstances of the offense.").

In support of aggravating factor c(4)(a), the State introduced into evidence two Judgments of Conviction for murder, one from 1959 and the other from 1984. The 1984 conviction was for the 1982 murder of William Ward.

To prove aggravating factor c(4)(c), the State called four witnesses, all of whom had testified during the guilt-phase trial and original sentencing proceeding.

Denise Hunter Aliano recounted the trip to Asbury Park, leaving Olesiewicz on the boardwalk, and returning to find her missing. On cross-examination, defense counsel established that the victim occasionally smoked marijuana, took quaaludes, and used cocaine.

Theresa Smith also testified consistent with her initial statement to the police. The prosecution asked Smith what defendant had told her about why he had shot the woman in the head. Smith answered that she and defendant had discussed it

and that defendant "just shot her, just felt like shooting her." She also testified that defendant had wanted her to kill someone for him: "He told me that he picked this girl up, it was supposed to be my victim and I wouldn't wake up so he killed her." On cross-examination Smith said that she and defendant had had a conversation late on the night of the murder, that during the conversation she had seen someone in the car parked in the driveway, and that defendant had told her that he had smoked marijuana in the car. Defense counsel also questioned Smith on defendant's status as a parolee in August 1982 and his concern about avoiding returning to prison.

A Monmouth County Prosecutor's Office investigator testified about the location of Olesiewicz's body when found in January 1983. Finally, the Monmouth County Medical Examiner confirmed that the cause of the victim's death had been multiple gunshot wounds to the head. On cross-examination the medical examiner stated that he found no indications that Olesiewicz had been tortured or physically abused while still alive.

The defense introduced only the videotaped testimony of Dr. Azariah Eshkenazi, a forensic psychiatrist who had testified during the original sentencing proceeding in 1983, and whose testimony had been videotaped. Thus, Dr. Eshkenazi's testimony in the proceeding under review was identical to his testimony in the earlier proceeding. The same tape had also been used in the sentencing phase of defendant's trial for the Ward murder.

The doctor testified that he had visited defendant three times in 1983 for a total of eight or nine hours and had reviewed records containing defendant's medical history. He indicated that defendant had suffered abuse as a child and had been institutionalized at the age of eight. Defendant had been diagnosed as schizophrenic, had been subjected to electro-convulsive shock treatments on twenty occasions, and had been treated for headaches by being constricted in a bed under tight,

wet, cold sheets. In those instances defendant had urinated on himself to keep warm. Dr. Eshkenazi diagnosed defendant as suffering from a severe personality disorder known as anti-social personality with paranoid traits. He concluded that at the time of the murder, defendant had "lacked the capacity to appreciate the wrongfulness of his act emotionally, though not intellectually." The doctor explained: "Intellectually he knew what he was doing * * *, but he certainly did not appreciate that it's wrong to kill somebody." He stated further that as a result of the described personality disorder, defendant's ability to appreciate the wrongfulness of his conduct or conform his conduct to the requirements of the law was "[f]rom an emotional point of view, completely impaired."

In summation, to refute the applicability of aggravating factor c(4)(c), defense counsel argued that defendant had a motive for the killing, namely, that defendant was afraid that Olesiewicz would report him to law-enforcement authorities for smoking marijuana and that as a consequence he would be returned to prison. The balance of the defense summation was essentially an effort to persuade the jury to spare defendant's life so that he could become an object of scientific study in an effort to find a cure for the anti-social personality disorder from which he suffered. The State, in its summation, highlighted that the underlying murder conviction was Biegenwald's third, and characterized defendant as an evil and cold-blooded killer for whom death was the only appropriate punishment.

The jury found unanimously and beyond a reasonable doubt that the State had proven each of the two aggravating factors. Although the verdict sheet indicated that unanimity was not required for the mitigating factors, the jury found 12-0 that extreme mental or emotional distress, c(5)(a), did not exist. Three of the twelve jurors found the existence of impairment by mental disease or defect, c(5)(d). (The verdict form did not mention intoxication in connection with that factor.) Four jurors found the existence of any other factor relevant to defendant's character or record, c(5)(h). The jury then found

unanimously and beyond a reasonable doubt that the aggravating factors outweighed the mitigating factors. Accordingly, the court sentenced defendant to death.

On defendant's appeal to this Court we denied defendant's motion to supplement the record but agreed to take judicial notice of records filed in other courts in this state in respect of defendant. We granted defendant's motion that the Court take judicial notice of portions of the defendants' briefs in *State v. Ramseur,* 106 *N.J.* 123, 524 *A.*2d 188 (1987), and in *State v. Koedatich,* 112 *N.J.* 225, 548 *A.*2d 939 (1988), and ordered that the State could rely on the corresponding points in its briefs in those cases.

## II

### —A—

### CONSTITUTIONALITY OF THE STATUTE

Defendant claims that the New Jersey Death Penalty Act violates the eighth amendment to the United States Constitution. In *State v. Ramseur, supra,* 106 *N.J.* at 185–90, 524 *A.*2d 188, and *State v. Koedatich, supra,* 112 *N.J.* 225, 548 *A.*2d 939, we upheld the constitutionality of the act in the face of equivalent challenges. We continue to adhere to those holdings.

### —B—

### PRESENTENCING–PROCEEDING ISSUES

1. *Gerald* Issue

Defendant claims he was never convicted of capital murder for the Olesiewicz murder because "there was no jury finding of a specific intent to kill, as opposed to an intent to cause serious bodily injury resulting in death, nor was there any finding that the murder was committed by defendant's 'own conduct.'" See *State v. Gerald,* 113 *N.J.* 40, 69, 549 *A.*2d 792 (1988). Therefore, defendant argues, his sixth-amendment

right to have all elements of a crime decided by a jury has been violated, as has his due-process right to be sentenced only for those crimes of which he has been convicted.

In *Gerald*, this Court held that "a defendant who is convicted of purposely or knowingly causing 'serious bodily injury resulting in death' under *N.J.S.A.* 2C:11–3a(1) and (2), or either of them—as opposed to one who is convicted of purposefully or knowingly causing death under those same provisions—may not be subjected to the death penalty." *Ibid.* In that case, because the jury had not specified whether it had found defendant guilty of serious-bodily-injury murder or intent-to-kill murder, and because on the evidence in the record it could have convicted defendant of the former, the Court reversed the conviction and remanded for a new trial.

The failure to distinguish between serious-bodily-injury murder and intent-to-kill murder has resulted in reversal of the death sentence in several cases. See, *e.g., State v. Harvey*, 121 *N.J.* 407, 581 *A.*2d 483 (1990); *State v. Pennington*, 119 *N.J.* 547, 575 *A.*2d 816 (1990). As we stated in *State v. Davis*, 116 *N.J.* 341, 367, 561 *A.*2d 1082 (1989), the Legislature "never intended that capital sentencing be imposed on a defendant unless the defendant had the purpose or knowledge of a killer." However, in *State v. Pitts*, 116 *N.J.* 580, 562 *A.*2d 1320 (1989), and *State v. Rose*, 120 *N.J.* 61, 576 *A.*2d 235 (1990), this Court rejected each defendant's contentions that he could not be exposed to a new capital sentencing proceeding absent a new jury determination of guilt, *i.e.*, whether the defendant in each case intended to kill or to cause serious bodily injury. In *Pitts*, the defendant had pursued his victims, inflicted multiple stab wounds, and checked to ensure that his victims were dead. In *Rose*, the Court found "no evidence that could have led a rational jury to conclude that defendant did not know that his conduct would cause the victim's death." 120 *N.J.* at 64, 576 *A.*2d 235. *See also State v. McDougald*, 120 *N.J.* 523, 577 *A.*2d 419 (1990) (absence of *Gerald* charge incapable of affecting

verdict); *State v. Hunt*, 115 *N.J.* 330, 558 *A.*2d 1259 (1989) (same).

The evidence relating to the Olesiewicz murder introduced at both the original trial and the resentencing proceeding indicated that defendant shot the victim four times in the head from close range while both were in Smith's car. Smith also testified that defendant had spoken to her about killing someone, and that defendant had killed Olesiewicz because Smith would not wake up and commit the killing. As in *McDougald, Rose, Pitts,* and *Hunt,* we conclude that the evidence provides no rational basis on which a jury could conclude that defendant shot Olesiewicz with an intent to cause serious bodily injury rather than death. We find inescapable the conclusion that the jury's verdict included a finding that Biegenwald intended to kill Anna Olesiewicz when he shot her in the head four times at close range.

This Court has explained that the "own conduct" requirement of the capital murder statute " 'is not an element of the offense of murder [but] is merely a triggering device for the death penalty phase of the trial.' " *Gerald, supra,* 113 *N.J.* at 99, 549 *A.*2d 792 (quoting *State v. Moore,* 207 *N.J.Super.* 561, 576, 504 *A.*2d 804 (Law Div.1985)). *But see* 113 *N.J.* at 146–47, 549 *A.*2d 792 (Handler, J., concurring in part and dissenting in part) ("own conduct" is element of capital murder); *State v. Moore,* 113 *N.J.* 239, 311, 550 *A.*2d 117 (1988) (Handler, J., concurring in part and dissenting in part) (same). The "own conduct" provision requires that a capital-murder conviction be based on a jury finding that "defendant *actively and directly participated* in the homicidal act, *i.e.,* in the infliction of the injuries from which the victim died." *Gerald, supra,* 113 *N.J.* at 97, 549 *A.*2d 792.

The prosecution originally charged both defendant and Dherran Fitzgerald with Olesiewicz's murder. The charge against Fitzgerald was dismissed in exchange for his testimony against defendant. *Biegenwald* II, *supra,* 106 *N.J.* at 21, 524 *A.*2d 130. Biegenwald's defense at the first trial was that Fitzgerald had

committed the murder. He produced witnesses who claimed that Fitzgerald had boasted that he had murdered Olesiewicz. *Id.* at 23, 524 *A.*2d 130. Defendant now claims that "the jury could have reasonably concluded that while defendant might have helped Fitzgerald to abduct the victim and dispose of her body (thus making him liable for murder as an accomplice), it was Fitzgerald who had fired the fatal shots." The State counters that "given the factual complex and the trial court's instruction in this case, the jury's verdict [in the guilt phase] constituted a finding that defendant committed the murder of Anna Olesiewicz by his own conduct."

Although we agree that a conviction on defendant's theory would not render defendant death-eligible, *Gerald, supra,* 113 *N.J.* at 100, 549 *A.*2d 792, neither that theory nor the facts or arguments that might have supported it were ever put before the jury. The summations at the trial presented the jury with two starkly-contrasting scenarios: either defendant shot Anna Olesiewicz by himself or, as defense counsel contended, Smith and Fitzgerald killed her. The guilty verdict indicates unmistakably that the jury determined that defendant committed the murder by his own conduct.

### 2. Denial of Request to Relieve Counsel

■ Defendant contends that the trial court erred by requiring one of his attorneys, Glen Vida, to continue to represent defendant during the resentencing proceeding and that that error denied him effective assistance of counsel in violation of the sixth amendment to the United States Constitution.

Defendant points to a similar motion by Vida three years earlier in the prosecution of defendant for the murder of Betsy Bacon to establish that a communication gap had developed between Vida, his New Jersey counsel, and Louis Diamond. Diamond, a member of the New York bar, had been admitted *pro hac vice* to represent defendant in several murder prosecutions against him in New Jersey. Vida indicated in support of

that motion that Diamond had not informed him of a guilty-plea-hearing date in connection with one of the other murder prosecutions. Vida also asserted that a dispute unrelated to the Bacon case had arisen between Vida and Diamond. The court denied the motion in respect of the Bacon murder prosecution.

Vida represented defendant on the underlying prosecution through this Court's determination in *Biegenwald* II. Following our reversal of the sentence and remand, Vida informed the trial court that his representation of defendant had terminated and that a request had been made of the Office of the Public Defender to represent defendant in relation to the resentencing proceeding. The assignment judge held a hearing to determine who would represent defendant, at which the following colloquy occurred:

THE COURT: The purpose of this Proceeding is to determine Mr. Biegenwald who is going to be representing you on the remand from the Supreme Court. And I have heard conflicting stories from counsel as to who is representing you, whether it is the public defender, whether it would be Mr. Vita [sic passim] or Mr. Diamond, or Mr. Diamond alone.

Who is it that you want to represent you?

MR. BIEGENWALD: I originally hired Mr. Diamond. Mr. Diamond hired Mr. Vita. As far as I am concerned, they both represent me.

THE COURT: All right. Because Mr. Diamond alone cannot represent you in New Jersey; because he is not admitted to practice in New Jersey. He must have local counsel from New Jersey.

Mr. Vita has indicated that he wasn't representing you any more, and his employment terminated with the Supreme Court appeal.

All right, anyone want to be heard?

MR. DIAMOND: No, Your Honor, I stand ready to try the case if I am allowed to.

THE COURT: Mr. Vita.

MR. VITA: I think we have been over it already Your Honor.

THE COURT: We were over it in chambers, but I think I want it on the record now.

MR. VITA: Sure. My position basically is Your Honor that I think that considering the nature of the penalty that Mr. Biegenwald is facing, that he deserves counsel that are in a tight working relationship. And I don't know whether or not that is the situation. I had previously discussed it with Mr. Biegenwald. Obviously his desires will have a large impact on what occurs.

THE COURT: Are you aware Mr. Biegenwald of any conflicts between Mr. Diamond and Mr. Vita?

MR. BIEGENWALD: No.

THE COURT: Are you satisfied to have both of them represent you on this remand?

MR. BIEGENWALD: Yes.

THE COURT: All right, I am of the opinion that Mr. Vita, your employment did not terminate with the decision of the Supreme Court. It is not a new trial as to the entire case. It has only been remanded on the death phase. The guilty conviction was affirmed. Accordingly, I will select a trial date and you will be of counsel with Mr. Diamond.

We reject defendant's contention that the court's refusal to relieve Vida was error. The decision whether to relieve counsel is committed to the sound discretion of the trial court, with a presumption against granting the request. *See State v. Lowery*, 49 *N.J.* 476, 231 *A.*2d 361 (1967) (policy of courts not to relieve competent counsel absent showing of substantial cause); *State v. Smith*, 43 *N.J.* 67, 202 *A.*2d 669 (1964) (same), *cert. denied*, 379 *U.S.* 1005, 85 *S.Ct.* 731, 13 *L.Ed.*2d 706 (1965). We cannot find either abuse of that discretion or any resulting prejudice to defendant. Admittedly, the trial court did not explore in detail on the record the nature of the dispute between counsel. The record reflects that the court may nevertheless have been aware of counsel's differences. Furthermore, Vida's statement equivocates on whether counsel would be able to provide representation appropriate to a capital-murder defense. The court viewed the resentencing proceeding as a continuation of the original trial. That view, when combined with the lengthy history of this prosecution and Vida's extensive, five-year involvement with the defense, provides an ample basis for the court's refusal to relieve Vida as counsel.

We also note that defendant never actually moved to have Vida relieved. Moreover, defendant indicated to the court that he was satisfied to have both Vida and Diamond represent him in the resentencing proceeding. Finally, we find the record devoid of any indication that Mr. Vida's participation resulted in a failure to provide effective counsel, neglected responsibilities, or "a breakdown in the adversarial process that renders the

result unreliable." *Strickland v. Washington*, 466 *U.S.* 668, 687, 104 *S.Ct.* 2052, 2064, 80 *L.Ed.*2d 674, 693 (1984); *accord State v. Fritz*, 105 *N.J.* 42, 58, 519 *A.*2d 336 (1987).

3. Failure to Change Venue *Sua Sponte*

■ Defendant did not move for a change of venue at the time of the resentencing proceeding. Nevertheless, he now contends that the trial court's failure to change venue on its own motion violated his constitutional right to a fair trial. Defendant claims that the publicity surrounding this case was so prejudicial that a fair trial before an impartial jury was impossible. He further contends that the failure to change venue resulted in the jury considering his guilty pleas to two murders in violation of his plea-bargain agreement in another case.

■ In *Biegenwald* II, *supra*, 106 *N.J.* at 30–37, 524 *A.*2d 130, we rejected a similar contention with respect to denial of defendant's motion for change of venue for the initial trial. As we indicated in *Biegenwald* II,

> It is axiomatic that a criminal defendant's right to a fair trial requires that he be tried before a jury panel not tainted by prejudice. *Irvin v. Dowd*, 366 *U.S.* 717, 722, [81 *S.Ct.* 1639, 1642], 6 *L.Ed.*2d 751, 755 (1961). We have emphasized the importance, particularly in capital cases, of the trial court's responsibility "to preserve the integrity of the jury and minimize the danger that prejudice will infiltrate the adjudicatory process * * *." [106 *N.J.* at 32, 524 *A.*2d 130 (quoting *State v. Williams*, 93 *N.J.* 39, 63, 459 *A.*2d 641 (1983) (*Williams* I)).]

In capital cases the trial court may in its discretion "change venue when it is 'necessary to overcome the realistic likelihood of prejudice from pretrial publicity.' *State v. Williams, supra*, 93 *N.J.* at 67–68 n. 13, 459 *A.*2d 641; *see State v. Bey*, 96 *N.J.* 625, 630 [477 *A.*2d 315], *clarified*, 97 *N.J.* 666 [483 *A.*2d 185] (1984)." 106 *N.J.* at 33, 524 *A.*2d 130. Because we have adopted "the distinction recognized by the federal courts between cases in which the trial atmosphere is so corrupted by publicity that prejudice may be presumed," *ibid.* (citing *Sheppard v. Maxwell*, 384 *U.S.* 333, 352, 86 *S.Ct.* 1507, 1517, 16 *L.Ed.*2d 600, 614 (1966)), and those in which the publicity is less

saturating, *see, e.g., Patton v. Yount,* 467 *U.S.* 1025, 1032–35, 104 *S.Ct.* 2885, 2889–91, 81 *L.Ed.*2d 847, 854–56 (1984), we must first identify the applicable standard for determining prejudice.

Without question this case does not warrant application of the presumed-prejudice standard. In *State v. Koedatich, supra,* 112 *N.J.* 225, 548 *A.*2d 939, we identified a non-exhaustive list of factors to consider in determining whether prejudice should be presumed: (1) evidence of extreme community hostility against defendant; (2) prominence of either the victim or the defendant within the community; (3) the nature and extent of the news coverage; (4) the size of the community; (5) the nature and gravity of the offense; and (6) the temporal proximity of the news coverage to the trial. *Id.* at 271–73, 548 *A.*2d 939. Consideration of those factors (save, of course, the nature and gravity of the offense) leads overwhelmingly to the conclusion that this case does not involve the extreme circumstances that cause a trial atmosphere to be so corrupted by publicity as to produce a presumption of prejudice. *Biegenwald* II, *supra,* 106 *N.J.* at 33, 524 *A.*2d 130. Consequently, we review the trial court's failure to change venue under the "actual prejudice" standard, *i.e.,* whether under the totality of the circumstances the *voir dire* and the trial court's handling of the jurors resulted in a fair and impartial jury.

In light of an appellate court's distance from the jury-selection process, we have indicated that deference to the trial court is appropriate. *E.g., Koedatich, supra,* 112 *N.J.* at 274–76, 548 *A.*2d 939. The nature of jury selection inherently requires evaluation of the demeanor of venirepersons, an assessment narrowly circumscribed on appellate review of an unanimated transcript.

*Voir dire* spanned three days. The trial court admonished the panel both before and after it administered the oath to the jurors that the members should avoid any media coverage of the proceeding. Before individual *voir dire* the venirepersons

were required to fill out a questionnaire that included the following questions:

6. The defendant, Richard Biegenwald, was a resident of Staten Island. Do you know him?
 YES ____ NO ____

7. Do you know any member of his family?
 YES ____ NO ____

8. Have you ever heard of him?
 YES ____ NO ____

19. Before coming here today had you ever *heard* of a murder case involving Richard Biegenwald from any source whatsoever either today or at any time previously?
 YES ____ NO ____

20. Had you ever read of a case involving Richard Biegenwald?
 YES ____ NO ____

21. Have you ever *discussed* him with anyone?
 YES ____ NO ____

Affirmative responses to any of those questions triggered additional probing by the trial court.

On individual *voir dire* sixty of sixty-four prospective jurors questioned indicated that they were in some way familiar with defendant's name. The court excused for cause eight venire-persons because it appeared their familiarity with other proceedings involving defendant would impair their ability to comply with their oath. Ten of the twelve deliberating jurors had indicated familiarity with defendant's name. One deliberating juror indicated awareness that defendant had been implicated with respect to more than one murder. "Jurors who have formed an opinion on the guilt or innocence of a defendant must be excused." *State v. Marshall,* 123 *N.J.* 1, 77, 586 *A.*2d 85 (1991). However, "we have long recognized that impanelled jurors need not be ignorant of the facts of the case." *Ibid.* (citing *Koedatich, supra,* 112 *N.J.* at 268, 548 *A.*2d 939; *State v. Sugar,* 84 *N.J.* 1, 23, 417 *A.*2d 474 (1980)).

Those venirepersons who indicated that they had formed an opinion concerning the appropriate sentence were properly excused. Although ten of the deliberating jurors indicated some recognition of defendant's name, their recollections were almost uniformly vague associations of defendant with the Olesiewicz murder and prosecution. The *voir dire* of the one deliberating juror who indicated awareness of more than one murder does not reflect awareness of any facts not to be presented and considered during the sentencing proceeding:

[Q.] You indicate you have heard the name Richard Biegenwald before?

A. Yes.

Q. Do you recall how it was?

A. Well, I ride to work every day and I had the radio on and it comes on the radio in the past.

Q. How much in the past are we talking about?

A. I have no idea, but I know I heard it on the radio.

Q. Talking about last week or way beyond—back beyond that?

A. I really don't know.

Q. All right. Do you recall whether it was used in any particular context, like Richard Biegenwald, criminal, or Richard Biegenwald mason, or—

A. No, accused of murder.

Q. Okay, So you associate Richard Biegenwald accused of murder kind of thing?

A. Right.

Q. Anything about the details of the murder you may have recalled?

A. I recall that one of the murders took place I think in Asbury Park, something about Asbury Park.

Q. Okay. Do you recall also there was more than one murder?

A. Yes.

Q. You said one of the murders?

A. Yes.

Q. Now you are thinking about that, was that your recollection of that?

A. I don't know.

Q. So we have Richard Biegenwald, murder associated with Asbury Park and another murder?

A. Yes.

Q. Okay.

A. You know, if there's anything more in your head, let me know?

A. That's about it.

Q. Well, is there anything that you may have heard even though your memory is indistinct which you think might work on you or affect you somehow or other if you sit as a juror here?

A. I don't think so.

&ast; &ast; &ast; &ast; &ast; &ast; &ast; &ast;

Q. In other words, you'd stick with what I say and put aside any pre-conceived notions you may have had?

A. Yes.

Q. That's my job, that's your oath?

A. Okay.

Q. Then as you sit there and evaluate yourself, knowing what we're asking all these questions about, do you believe that if you are selected to sit as a juror on this case, that you could be open minded to the proofs that are put to you, that you could weigh the proofs, the good and the bad, weigh both sides, listen to the law as I explain it and then come to a conscientious decision as to whether the penalty should be death or life imprisonment with no parole for at least 30 years?

A. Yes.

THE COURT: Any additional questions?

MR. DIAMOND: Yes, your Honor, if you could inquire, having had the knowledge that he says he does that there were additional murders, does that have an additional effect upon him weighing the mitigating factors than if he didn't hear about that previously?

THE COURT: All right. With that in mind, you may have heard something about at least another murder floating around, where does that leave you in so far as your ability to decide this case on what's presented in the courtroom?

THE JUROR: I'd have to take only in consideration what I'm here for.

THE COURT: Well, that's true, but we want to make sure you are not just saying that to please us but it really is true, that you would put aside whatever it was that you heard?

THE JUROR: Yes.

THE COURT: Okay. The other thing that's important if you stay here is you do not idly discuss whatever it was that you heard a long time ago on the car radio with any of the other jurors here. Because that's getting, you understand, outside information some how or other and that's completely improper?

THE JUROR: Yes, I understand that.

The *voir dire* of that juror on the issue of pretrial publicity was thorough and extensive. The court offered defense counsel the opportunity to probe further. No challenge or objection was made. We will not second-guess the trial judge's evaluation of the effect of pretrial publicity on that juror.

We conclude that the jury impanelled was free of any taint from pretrial publicity. The *voir dire* adequately disclosed

exposure to publicity. There was no need to change venue *sua sponte* or otherwise. Nor do we find that there was any breach of defendant's plea agreements in other cases because there is no indication that evidence relating to defendant's other murder convictions entered into the deliberation process.

■ We pause briefly to consider and reject defendant's related contentions that two specific circumstances caused him to be denied a trial free of taint from publicity. The first is an article, containing inadmissible and assertedly erroneous information, that appeared in the Asbury Park Press the morning of the second day of *voir dire*. Defense counsel brought the article to the court's attention before that day's proceedings commenced, and each prospective juror was asked whether he or she had complied with the court's frequent admonitions to avoid media coverage. There is no indication that the substance of the article came to the attention of any member of the jury, much less that it infected the jury's deliberations. The court's diligence in instructing the jury to avoid media coverage and discussions concerning the case was exemplary, and the presumption that the jury adhered to the court's direction has not been overcome.

■ Second, defendant objected to the court's failure to excuse for cause a juror who had knowledge of facts relating to other murder investigations of defendant. The juror was qualified on the third and final day of *voir dire* and defense counsel excused her peremptorily during that same morning session. Defense counsel also moved for a mistrial based on the juror's presence in the jury room, colorfully characterizing her as a "hand grenade" that might trigger mass recall of inadmissible evidence by the other jurors.

Although the argument that the juror should have been excused for cause is persuasive, we find the failure to have excused her unproblematic for several reasons. Foremost the juror did not deliberate; she was excused peremptorily shortly after she had been qualified. Consequently, the juror's pres-

ence in the jury room was brief and ended before the jury was exposed to the evidentiary phase, which, particularly in a murder case such as this one, can understandably pique the urge to discuss the case. Of equal importance is the judge's scrupulous reminder to each qualified venireperson that any discussion about the case was strictly forbidden, particularly his admonition to that juror:

MR. DIAMOND: Judge, I have no more questions. Could we instruct the proposed juror on the items we discussed here, they were not to be discussed with any of the other jurors at any time.

THE COURT: Oh, I tell each juror and I will tell [this juror] when you go into the jury room you are not supposed to discuss this with anybody there. The only time to do any discussing about this case at all with your fellow jurors if you sit is when you are deliberating at the end of the case.

A. Yes, I understand that.

MR. DIAMOND: I'm sorry, would that also include any prior knowledge?

THE COURT: Anything relating to this case, I think that's pretty clear and this lady seems to understand that and I'm not going to fine tune it because you don't understand it. Okay? You understand what I'm saying?

The juror indicated that she had not had discussions relating to defendant with any person other than her husband; we are unpersuaded that there is a reasonable likelihood that she infected the jury during her brief stay in the jury room.

—C—

ADEQUACY OF VOIR DIRE

Defendant contends that the *voir dire* for the resentencing proceeding was inadequate in several respects. First, he argues that the trial court erred by failing to define murder for the jury panel and by refusing defense counsel's requests that potential jurors be asked in which types of cases they would be willing to impose the death penalty. According to defendant, those errors combined to deny him his constitutional right to a fair and impartial jury.

Second, defendant argues that the court erred by refusing to inform potential jurors that defendant had prior murder convictions and by failing to probe whether knowledge of those

convictions would impair their ability to determine punishment in accordance with the law. Essentially, defendant claims that the *voir dire* failed to identify jurors who would "automatically" sentence a triple murderer to death without considering evidence of mitigating factors. Because such jurors would have been excludable for cause, defendant contends that the trial court's ruling denied him his constitutional right to a fair and impartial jury.

Finally, defendant contends that the exclusion for cause of Stephen Ficsor because he acknowledged that imposing the death penalty would be "very difficult" denied him his constitutional right to due process and a fair and impartial jury. Underlying those contentions, and the venue challenge discussed *supra* at 20–27, 594 *A*.2d at 181–185, is the argument that the *voir dire* as a whole was insufficient in scope and depth to ensure sentencing by a fair and impartial jury.

■■ The contention relating to Ficsor is meritless. The questioning of that juror demonstrates that there was ample reason to doubt his ability to follow the law or to abide by his oath. He indicated dissatisfaction with the limited sentencing options available. He also could not say that he could sentence a person to death even in the case of a gruesome killing. The record indicates a sufficient basis for the trial court's decision that Ficsor's ability to act as a juror was substantially impaired within the meaning of *Wainwright v. Witt*, 469 *U.S.* 412, 105 *S.Ct.* 844, 83 *L.Ed.*2d 841 (1985), and *Adams v. Texas*, 448 *U.S.* 38, 100 *S.Ct.* 2521, 65 *L.Ed.*2d 581 (1980). *See State v. Ramseur, supra*, 106 *N.J.* at 256, 524 *A*.2d 188.

Although we do not rely on it, we also note that counsel did not object to the exclusion of Ficsor, nor did he request further questioning. We reject defendant's contention that the trial court abused its discretion by excusing Ficsor on the basis of such a sterile record. See *State v. Hunt, supra*, 115 *N.J.* at 357, 558 *A*.2d 1259 (sound measure of discretion in trial court to

determine whether potential juror's views would prevent or substantially impair his or her ability to decide sentence).

■ Defendant's remaining arguments, however, present more difficult problems. Taken together, the alleged errors and omissions raise serious doubts about the efficacy of the jury-selection process. The similarities between this *voir dire* and the one addressed in *Williams* II, *supra*, 113 *N.J.* 393, 550 *A.*2d 1172, are plentiful, obvious, and disturbing. That neither defendant nor the State exhausted its complement of peremptory challenges is of no consequence if the *voir dire* failed to produce sufficient information to allow counsel or the court to challenge prospective jurors intelligently, either for cause or peremptorily. As this Court stated in *Williams* II,

> counsel must be afforded the opportunity for a thorough *voir dire* to evaluate and assess jurors' attitudes in order to effectively participate in jury selection. If counsel is unable to screen out prejudice and bias, that inevitably leads to unfair juries. This result—*or the possibility of this result*—cannot be tolerated. [*Id.* at 409, 550 *A.*2d 1172 (emphasis added).]

The right to a fair and impartial jury is guaranteed under both the federal and the state constitutions. *U.S. Const.* amends. VI & XIV; *N.J. Const.* art. I, para. 10. The protection afforded that fundamental right is heightened in capital cases. *Ramseur, supra,* 106 *N.J.* at 324 n. 84, 524 *A.*2d 188. .

In *Williams* II, we were faced with the issue of whether the trial court had abused its discretion when it refused to ask jurors who favored the death penalty in some cases whether they would automatically favor the death penalty if the defendant had committed murder and rape, as alleged in the indictment. We held that the refusal to pursue that line of inquiry was "serious error" and "a significant component of the deficiencies" that necessitated reversal of both the sentence and the conviction of that defendant. 113 *N.J.* at 417, 550 *A.*2d 1172.

> [I]t follows that a juror who will not, or cannot, consider relevant mitigating evidence pertaining to the defendant because the crime involves rape and murder is "substantially impaired" under the *Adams– Witt* test. Therefore, the failure to inquire into whether any juror could consider the mitigation evidence

if it was established that defendant was guilty of rape and murder denies counsel and the trial court the tools with which to insure that the jury panel could fairly undertake its role in this case. [*Ibid.*]

With the mere interchange of "another murder" for "rape," that reasoning is equally applicable to the present circumstances.

The State now argues that *Williams* II is somehow distinguishable on this issue. We disagree. In both cases, the line of questioning disallowed by the trial court related to a statutory aggravating factor the existence of which jurors are expected—indeed, if established, obligated—to consider in their sentencing deliberations. That the rape in *Williams* II was intertwined with the circumstances of the murder for which that defendant was being prosecuted, while the other murders to be considered in this case arose out of separate occurrences, is of no moment. Any distinction stems merely from the wording of the provisions enumerating the aggravating factors. *Compare N.J.S.A.* 2C:11–3c(4)(g) ("offense was committed while the defendant was engaged in the commission of * * * [a] sexual assault") *with N.J.S.A.* 2C:11–3c(4)(a) ("defendant has been convicted, at any time, of another murder").

The inquiry in both cases goes beyond the level of precluding intrusion into the sentencing determination of non-specific-statutory aggravating factors. In *Williams* II, we recognized that the brutality of a rape and murder could blind venirepersons in the performance of their duties as jurors. Similarly, we are convinced that knowing a defendant had killed before could cause an otherwise fair-minded person to disregard evidence offered in support of mitigating factors. *Cf.* D. Baldus, G. Woodworth & C. Pulaski, *Equal Justice and the Death Penalty* 318–20 (1990) (reporting probability that sentence of death will be imposed increased by 520 percent for each prior murder conviction).

The reasoning of *Williams* II is not limited to circumstances surrounding the murder for which a defendant is being prosecuted. Under the United States Constitution and our

system of capital punishment, the sentencer must consider not only "the circumstances of the particular offense" but also "the character and record of the individual offender." *Woodson v. North Carolina*, 428 *U.S.* 280, 304, 96 *S.Ct.* 2978, 2991, 49 *L.Ed.*2d 944, 961 (1976); *accord Williams* II, *supra*, 113 *N.J.* at 417, 550 *A.*2d 1172. Hence, the *voir dire* should include questioning about evidence of aggravating factors that will be presented during the sentencing proceeding and that may with reasonable likelihood have such an effect on a prospective juror as to render him or her "substantially impaired" under the *Adams–Witt* standard.

The State also argues that *Williams* II is distinguishable because there—unlike this case—defendant exhausted his allotment of peremptory challenges. That contention misperceives the problem created by the refusal to permit *voir dire* about the impact of other murder convictions on prospective jurors. By prohibiting that inquiry, the court "denied counsel and the trial court the tools with which to insure that the jury panel could fairly undertake its role." *Williams* II, *supra*, 113 *N.J.* at 417, 550 *A.*2d 1172. Whether defendant exhausted his allotment of peremptory challenges is not dispositive. The refusal to inquire about the effect of other murder convictions denied defendant the information necessary to exercise those challenges intelligently and effectively. Furthermore, the inquiry might have identified jurors who were unable to consider relevant evidence in support of mitigating factors when faced with a recurrent murderer. Such jurors would have been excusable for cause under our capital-punishment system. *Ibid.*

In ruling that questioning concerning the impact of other murders is not required, the trial court concluded that such an inquiry would amount to "shopping with the jurors to find out when their tendencies will be overborne to a point where they go for death." Although the court may have been correct in its characterization, it erred in its implicit conclusion that "shop-

ping" is not permissible or appropriate. In fact, it is necessary. We return again to *Williams* II:

Once the trial court has elicited from each juror sufficient information concerning that person's predilections * * * then counsel's ability to formulate and argue for excusal for cause is enhanced. More importantly, the trial court will have a more complete record on which to apply the *Adams– Witt* standard in granting or denying excusals for cause. This enhanced record is imperative to preserve society's interest in a fair trial. Greater disclosure will also undoubtedly aid both the defense and prosecution in the exercise of their respective peremptory challenges. [113 *N.J.* at 413, 550 *A.*2d 1172.]

As we recently stated in *State v. Moore,* 122 *N.J.* 420, 446, 585 *A.*2d 864 (1991), *"voir dire* acts as a discovery tool."

It is not enough just to ask jurors in a capital case whether the nature of the crimes would affect their ability to be fair in deliberating on a death sentence versus a term of years. The question is correct so far as it goes, but it really invites only one answer. [*Id.* at 449, 585 *A.*2d 864.]

In *Moore* we explained that *State v. Manley,* 54 *N.J.* 259, 255 *A.*2d 193 (1969), does not compel such a limited *voir dire.* In *Manley* the Court revised the procedures for conducting *voir dire* in response to abuse of such procedures by counsel:

The impression is inescapable that the aim of counsel is no longer *exclusion* of unfit or partial or biased jurors. It has become the *selection* of a jury as favorable to the party's point of view as indoctrination through the medium of questions on assumed facts and rules of law can accomplish. [*Id.* at 281, 255 *A.*2d 193.]

The new procedures returned to the trial court the primary responsibility for conducting *voir dire.* We held in *Biegenwald* II, *supra,* 106 *N.J.* at 29, 524 *A.*2d 130, that those revised procedures applied to capital-murder cases. Regrettably, we perceive from the records in many of the cases coming before us that trial courts have read *Manley,* in conjunction with *Adams* and *Witt,* to limit *voir dire* to the bare minimum necessary to qualify a juror. See *State v. Dixon,* 125 *N.J.* 223, 593 *A.*2d 266 (1991); *State v. Moore, supra,* 122 *N.J.* at 445, 585 *A.*2d 864 ("One of the problems that we have in capital cases is that the constitutionally-limited *Adams–Witt* standard for disqualification of jurors in capital cases * * * gets confused with the more general inquiry into juror predispositions or preferences that should mark the general jury-selection process.").

The procedures set forth in *Manley* and those approved by *Adams* and *Witt* are minimum requirements. Blind adherence to those standards and procedures does not necessarily produce a thorough and searching *voir dire*. An adequate *voir dire* should incorporate the suggestions of *Williams* II and *Moore* with an eye toward providing counsel and the court with the tools necessary to perform their respective tasks comprehensively and intelligently.

We note in this case that the State, to its credit, acknowledged the need for inquiry about other murder convictions during *voir dire*. It brought the opinion in *Williams* II to the trial court's attention and even went so far as to submit a proposed question for the court to use:

> As I previously advised you, the decision as to what is the appropriate penalty in connection with this matter will depend upon the existence of aggravating factors and mitigating factors and you will then weigh these as I will instruct you at the end of this case.
>
> The legislature has listed a number of aggravating factors and has also listed a number of mitigating factors. One of the aggravating factors the legislature has listed and the State contends exists is that the defendant * * * had been previously convicted of murder. Could you consider the mitigating evidence even if the State proved that the defendant had previously been convicted of murder?

Without endorsing the exact question proffered by the prosecution or suggesting that a single question can accomplish the task, we are impressed with the obvious merit of the State's proposal. In light of *Williams* II—and particularly in light of the positions of the parties—the trial court's refusal to inquire about the impact that knowledge of other murder convictions would have on the ability of prospective jurors to credit or consider the evidence in mitigation is mystifying.

 The refusal to permit questioning on the impact of other murder convictions during *voir dire* constitutes serious error. Such error, however, is not irremediable. Defendant's sentence may be upheld if the *voir dire* was otherwise so thorough and probing as to ensure that the jurors empaneled had the "capacity to credit the evidence in mitigation," *State v. Bey*, 112 *N.J.* 123, 154, 548 *A.*2d 887 (1988) (*Bey* II), and the

ability to perform their duties in accordance with the court's instructions and their oaths, *see Adams v. Texas, supra,* 448 *U.S.* at 45, 100 *S.Ct.* at 2526, 65 *L.Ed.*2d at 589. On reviewing the jury-selection process as a whole, we conclude that it was constitutionally flawed.

Notwithstanding the broad discretionary powers vested in the trial court regarding the jury-selection process, *Biegenwald* II, *supra,* 106 *N.J.* at 37, 524 *A.*2d 130; *State v. Jackson,* 43 *N.J.* 148, 160, 203 *A.*2d 1 (1964), *cert. denied,* 379 *U.S.* 982, 85 *S.Ct.* 690, 13 *L.Ed.*2d 572 (1965), we have suggested several ways of ensuring an efficacious *voir dire,* particularly in capital cases. The near-total absence here of use of methods recommended for conducting *voir dire* leaves us unable to conclude that defendant's right to a fair and impartial jury was not abridged.

In *Williams* II, *supra,* 113 *N.J.* 393, 550 *A.*2d 1172, and *Williams* I, *supra,* 93 *N.J.* 39, 459 *A.*2d 641, we suggested several approaches to conducting an adequate *voir dire* in capital cases. We identified the use of open-ended questions as "an important ingredient" in the death-qualification inquiry. *Williams* II, *supra,* 113 *N.J.* at 413, 550 *A.*2d 1172. We also endorsed the practice of providing prospective jurors with an outline of this state's death penalty statute and questioning them regarding their opinions of the statute. *Id.* at 412–13 n. 5, 550 *A.*2d 1172. We indicated that posing "hypothetical examples to probe how various factors might affect a person's decisionmaking process" is proper. *Ibid.* Particularly revealing in relation to defendant's contentions about the failure to define murder is the following:

> Knowledge about what constitutes capital murder * * * and the use of the "aggravating and mitigating factors" scheme during sentencing will enable all potential jurors to answer questions concerning the death penalty free of misconceptions and faulty assumptions concerning how the law is administered in this state. [*Ibid.*]

In *Williams* I, we were presented with the conflict between a defendant's right to a fair trial and the media's right of access to newsworthy occurrences. We suggested as an alternative to

closure of the proceedings that the trial court should "consider the efficacy of more exhaustive and searching *voir dire* examinations. The Court in conducting the *voir dire* should be particularly responsive to the requests of counsel regarding the examination of prospective jurors [concerning] potential bias." 93 *N.J.* at 68, 459 *A.*2d 641. Indeed, we have noted that "in capital cases trial courts should be especially sensitive to permitting attorneys to conduct some *voir dire*." *Biegenwald* II, *supra*, 106 *N.J.* at 30, 524 *A.*2d 130. Finally, we have indicated that the court should "consider whether there should be a greater willingness to resolve doubts in favor of the defendant in excusing jurors for cause." *Williams* I, *supra*, 93 *N.J.* at 68, 459 *A.*2d 641.

The *voir dire* in this case, as in many other cases, proceeded in a consistent, if not monotonous, pattern. After the prospective jurors had completed the questionnaire, the court conducted individual examinations beginning with review of the answers on the questionnaire. Most potential jurors were questioned concerning their prior knowledge of Biegenwald or cases involving him. Each person was asked for his or her views on the death penalty. The court then followed up with questions concerning the potential juror's ability to follow the law as instructed. The court also questioned prospective jurors concerning their willingness to credit psychiatric testimony. Questioning by counsel was minimal and proceeded almost entirely through the court.

On at least eight occasions, the court rejected defense counsel's request, based on the potential juror's response to the individualized questioning, for additional inquiry about a venireperson's views on the death penalty. That is in addition to rejecting defense counsel's request for such questioning as a matter of course.

A review of the *voir dire* of juror Mitchell provides a sense of the court's approach to death qualification:

Q All right. The obligation of the jurors here in this trial is a limited one as I explained, has to do with which penalty is appropriate to this situation based upon aggravating factors that are presented and mitigating factors that are presented unless those words throw you, I don't think they should, but aggravating factors would be those things which would tend to lean you towards the death penalty, mitigating factors would tend to lean you away from the death penalty and toward life imprisonment with no parole for 30 years, those are the two options?

A Yes.

Q Since death is a possible option, what do you think generally about the death penalty?

A It applies in certain cases and sometimes it doesn't, it's not something that I have taken a position on definitely, that it goes or doesn't go in cases.

Q There are some people conscientiously think the death penalty should never be imposed and they are entitled to that view. That's not your view?

A No.

Q There are also some folks who are more, if you will, hard-nosed and they would say if there is a murder involved whoever is convicted of that murder should get the same penalties, death penalty. Are you of that persuasion?

A No, I think you have to weigh each case by its merits.

Q Okay, part of the evidence that will be presented to you is that of Dr. Eshkenazi, I mentioned his name yesterday, he's a psychiatrist. Anything about psychiatric testimony which you think is less worthy of acceptance than maybe other kind of medical testimony?

A No, sometimes, in some cases it's very valid.

Q At the end of the case after you have heard all the evidence on the aggravating and mitigating factors, I'll be explaining to all the jurors who sit how they should handle those and what principals [sic] of law apply to the decision. I tell you that your obligation under your oath is to accept the law as I explain it and not to substitute for it your own views as to what you think the law is or what it ought to be, you think you can do that?

A Yes, sir, I do.

Q Sitting there now and knowing it's important to all of us, you think that if you are selected as a juror on this case you would be able to sit, listen in that open minded way that I have described before, make your evaluation and then decide what is the appropriate penalty and do that fairly, objectively and conscientiously?

A I believe so.

THE COURT: Any additional questions of the prospective juror?

　　　*　　　*　　　*　　　*　　　*　　　*　　　*　　　*

MR. DIAMOND: Judge, before the next witness is called, I seem to have a problem, not with you, your Honor, but the answer, the nature of the answer that a lot of them are giving is always the same answer. It would depend upon the facts and it just seems to me there is a coachment in there like I believe it's Mr. Sacchi who said before that, you know, he wouldn't want

somebody who has come out of jail and he heard [sic: hurt] somebody else again, I have the terrible feeling in my mind, it depends upon the facts, depends upon the facts that he murdered more than one person.

THE COURT: Depends upon the murder, depends upon the circumstances, but their answer is their answer, you know, you may not like that answer but it's absolutely the correct answer.

MR. DIAMOND: I agree, I realize it's the correct answer for the person and if it's all of them who believe anybody who kills more than once, then there's no question in my mind, it's a tough thing, I know it's a tough thing. I wonder if there's something we could ask them what they mean by that. If they could elaborate on that aspect a little bit more.

THE COURT: You come up with a question, give it to me sometime.

MR. DIAMOND: The question is simply, Judge, depending on the circumstances, what are the circumstances?

THE COURT: No, because then I'm shopping with them. They will say gee, if he stabbed him in the back 16 times or—

MR. DIAMOND: It's not a question of shopping, you are asking them already the simple question that "can you sit on a murder case and do you feel you would always vote for the death penalty or you would never vote for it?" Once you asked that question you are in the market place. This question of shopping only applies if we're going to go up and down the scale. It's not like it's a mark-down today and it's going to be four murders tomorrow. Always going to be three murders, no shopping involved at all.

We know there are three murders, they should be allowed to know there are three. At least ask them if under certain circumstances, they may have some outlandish reason, if they all seem to say if a person killed somebody more than once and not put to death, then we're going to do it this time. That's not shopping. We know the specific amount, we're not haggling over the price, there's three murders. If you are not going to do that, at least ask them what they mean when they say special circumstances on their mind already, it's not a shopping expedition.

THE COURT: Okay, you speak in colorful language, I'm satisfied the questioning so far is in accordance with constitutional mandates and I'm not going to go beyond that as you suggest unless there's something in the specific answer, not that general answer which is, you know, God knows the right answer, we assume most people are that way, that they are willing to weigh and it will depend upon the circumstances, that's the right answer.

I'm not going to ask them what kind of circumstances would cause you to go one way or another. No, I'm not going to do that.

MR. DIAMOND: Well, would you ask—

THE COURT: No more, I have ruled.

MR. DIAMOND: Stop you from weighing—

THE COURT: Don't keep coming back at me with another "if." I have ruled.

The suggestion in the colloquy that there is a "correct" answer to the open-ended question "what are your views on the death penalty?" is most troubling. Although such an open-ended question is undeniably a proper jumping-off point for death qualification, the vapid response "it depends on the circumstances" in no way reduces the need for additional probing of a venireperson's views on the appropriateness of the sentence of death. The purpose of *voir dire* is not to elicit from a potential juror the correct answer; it is to draw out the potential juror's views, biases, and inclinations and to provide both counsel and the court the opportunity to assess the venireperson's demeanor. We reiterate that *voir dire* should proceed with the conscious object of providing court and counsel alike with sufficient information with which to challenge potential jurors intelligently—whether for cause or peremptorily.

The court's initial open-ended question and variations on the "it depends" response were too often followed by closed-ended, suggestive questions that, not surprisingly, elicited the obvious "correct" response. For example, venireperson Black responded to the question "what do you think about the death penalty?" in this way:

A Personally it's really more up to how the state of the victim was, the person was with the defendant, at the time was he mentally out of control, but I have no views, really, I don't go either way, never sat down and thought about killing somebody because of a crime.

Q Well, are you saying that your judgment will depend upon what proofs are presented to you?

A *Yes.*

Q Depending upon the proofs, you could go either towards the death penalty or towards life imprisonment one way or the other?

A *Yes.*

Q All right. As I said to the jurors, what will be presented will be evidence on what are called aggravating factors and mitigating factors, those are big words, really come down to pluses and minuses as to the individual, Mr. Biegenwald.

Do you think you could listen to all the pluses and minuses and then under the law as I'll explain it decide what the right penalty should be?

A *Yes.* [Emphasis added.]

The court invited additional questions from counsel, but defense counsel declined. Ms. Black was later excused peremptorily by the State.

In one instance, when the response of the venireperson raised the issue of the impact of another murder conviction, the court did assure itself that the potential juror would remain open to the option of life imprisonment. Venireperson Russo answered the general query concerning his views on the death penalty this way:

A I think it's good in some ways, if a person is—I mean has committed a murder, I mean if it's so strict they have committed more than one murder, I do believe in the death penalty, I think that's the right way.

Q If they have committed more than one murder?

A Yes.

Q So that you would be inclined towards the death penalty if that were presented to you?

A Yes.

Q If it were presented to you, would that mean that you wouldn't pay any attention to what the mitigating evidence was?

A No, I mean, the factors are there that it was to a certain degree more brutal than another murder per se, I wouldn't lean more towards the death penalty.

Q But even with another murder in your words, would you still be willing to listen and open to the possibility that the mitigating factors might still outweigh even that?

A Oh, yes, I'd listen, yes.

Q So even with another murder, it's possible, I think from what you said, you still could vote for life imprisonment with no parole for at least 30 years?

A Yes.

Q Depending upon what you hear?

A Yes.

Q Understand I'm not trying to lead this perspective [sic] juror but that's the way I hear him saying his responses to me.

At the end of the case I'll be explaining what the law is, how the jury is to approach their decision, that's really what the law comes down to. Do you believe you'd be willing to accept that law as I explain it without tinkering with it in your own mind to suit your own views?

A Yes.

Defense counsel excused Russo peremptorily. Were that method of questioning employed throughout the *voir dire* process, our result might well be different. Unfortunately, we find that the death-qualification questioning of Mr. Russo was the excep-

tion and the interrogation of Ms. Black is representative of the normal course.

The error of refusing to probe more thoroughly the death-penalty views of the jurors was compounded by the absence of indoctrination on the applicability of the death penalty and the crime of murder. The court identified the basis for Biegenwald's murder conviction during the general *voir dire:*

> To assist you in answering some of the questions it will be necessary that you have some understanding of the charge that was contained in the Indictment upon which Richard Biegenwald has been found guilty of murder. The Indictment in that regard reads that Richard Biegenwald, on or about the 28th or 29th day of August, 1982, in the City of Asbury Park, did commit the crime of murder of a girl by the name of Anna Olesiewicz. Her name will come up and that's the charge and he's been found guilty of that. He did that.

When the response of a venireperson indicated a possible misunderstanding of the law, the court attempted to clarify by disclosing that a death sentence could be imposed only on a defendant convicted of murder. Although we agree with the observation of the State that "murder is not such an uncommon occurrence in our society," we do not accept the proposition that the average juror should be expected to be capable of drawing the legal distinction between capital murder and other killings. In fact, the responses of more gregarious venirepersons suggest that without instruction, they are not so capable. One prospective juror indicated that the death penalty would be appropriate in some cases but not for accidental killings. Another indicated that her decision would depend on whether the defendant was "mentally out of control." The death-qualification questioning of venireperson Luzzati demonstrates the potential prejudice that could arise from the failure to educate potential jurors:

> [Q] What are your own views of the death penalty if we might ask?
> A It's how serious the crime was, if it was cold blooded murder, I feel that his life should be taken, too. If it was an accident, that's something totally different.
> Q If it's an accident it's not murder.
> A I don't know what the circumstances were.
> Q There's no such thing as accidental murder.

A That's the way I feel about it.
Q All right. Are you saying then that if it's a real murder, the death penalty ought to be imposed?
A From what I can understand, just from what you had told us.
Q No, what I told you was there were two options, that's what I told you.
A I feel if it was intentional, then his life should be taken, too.
Q You can't have a murder without it being intentional?
A Then his life should be taken.

Mr. Luzzati was excused; however, the exchange evinces the danger inherent in a procedure wherein equivocal answers to the initial open-ended question were followed by lengthy questions that suggested the "correct" response. To admonish a potential juror that "we're talking only about murder here" is ineffective in the absence of an explanation of the meaning of murder under New Jersey law. In common parlance, murder and killing are interchangeable. Murder as used in the criminal-law system has a precise meaning, and capital murder is even more narrowly circumscribed.

With the notable exception of the court's initial question concerning a venireperson's views on the death penalty, the routine examination consisted of a series of leading, closed-ended questions. Although the court invited follow up from counsel, it refused to allow such inquiry at critical points. The court failed to educate the potential jurors concerning the laws of New Jersey relating to murder and capital punishment except in the most general terms. It rejected hypothetical questions designed to draw out bias and predisposition.

We acknowledge the paucity of objection by defense counsel. However, whatever lack of zealousness and vigor one might ascribe to defense counsel in no way diminishes our duty to ensure that defendant is sentenced by a fair and impartial jury, each member of which is capable of considering evidence in support of aggravating and mitigating factors before reaching a conclusion on the appropriate punishment. The lapses in the *voir dire* employed here foreclose a conclusion that jury members were properly death-qualified. "The right to a fair trial must be diligently protected to insure that all defendants,

regardless of the crime charged or the weight of the evidence produced, are tried by a fair and impartial jury." *Williams* II, *supra*, 113 *N.J.* at 409, 550 *A.*2d 1172; *accord Williams* I, *supra*, 93 *N.J.* at 61, 459 *A.*2d 641 ("The death penalty is a categorical imperative for trial fairness.").

No matter how convinced we may be of defendant's guilt, unless we are similarly convinced of the jury's impartiality, we cannot allow the death penalty to be imposed. When the basic procedure designed to assure that impartiality—challenges for cause, peremptory challenges, and a searching *voir dire*—are improperly applied so as to seriously weaken their combined effectiveness, a new trial is necessary. [*Williams* II, *supra*, 113 *N.J.* at 445, 550 *A.*2d 1172.]

We are unable to conclude that the inadequacy of the death-qualification process was harmless error. Nor can we attribute that inadequacy to a strategic decision by defense counsel. See *State v. Marshall, supra,* 123 *N.J.* at 93, 586 *A.*2d 85. Because the jury may have included members who were "substantially impaired," the sentence must be set aside.

*Mu'Min v. Virginia,* —— *U.S.* ——, 111 *S.Ct.* 1899, 114 *L.Ed.*2d 493 (1991), confirms that "the subject of possible bias from pretrial publicity must be covered—which it was—but that questions specifically dealing with the content of what each juror has read [need not] be asked." *Id.* at ——, 111 *S.Ct.* at 1908. Here, not only was the specific question about the prior murder convictions rejected, but the subject was not covered sufficiently or almost at all. Justice Stein ignores the deficiencies that compound the error of not asking about the impact of the prior-murder-conviction factor—*i.e.,* the lack of open-ended questions, hypothetical questions, prior-murder-conviction questions based on individual responses, and instruction on what constitutes "capital murder" in New Jersey. See *post* at 105, 594 *A.*2d at 229 (Stein J., dissenting). The subject of possible blinding bias from that known factor—bias that would render a potential juror excludable for cause—simply was not covered. Hence, we do not read *Mu'Min* to compel a result different from ours.

Finally, we recognize that our finding that defendant is entitled to *voir dire* potential jurors on the possible blinding

impact of the c(4)(a) factor most likely will require a two-jury system for all capital cases in which the State seeks to prove that factor. That is because aggravating factor c(4)(a), unlike all other aggravating factors, is proved by evidence not generally admissible during the determination of guilt or non-guilt. *See Evid.R.* 55.

One of the purposes of the bifurcated-trial system established by the New Jersey Death Penalty Act is to prevent the jury's determination of death-eligibility from being influenced by evidence relevant only to adjudgement of the appropriate sentence. *See State v. Pinnell,* 311 *Or.* 98, 121, 806 *P.*2d 110, 116 (1991) ("One of the purposes of the bifurcated trial is * * * to prevent the jury's verdict on [non-guilt] or guilt from becoming tainted by evidence of defendant's bad character that is admissible only in the penalty phase."). Although a single jury is preferable, the Legislature has explicitly provided for empaneling a separate jury for the sentencing proceeding on a showing of "good cause." *N.J.S.A.* 2C:11–3c(1); *cf. State v. Long,* 119 *N.J.* 439, 475, 575 *A.*2d 435 (1990) (recognizing that other-crimes evidence admissible during guilt phase may be too prejudicial during penalty phase and be irremediable by a limiting instruction); *State v. Moore, supra,* 113 *N.J.* at 277, 550 *A.*2d 117 (recognizing that when limiting instructions are insufficient to protect a defendant from prejudice from other-crimes evidence, court may have to impanel a new jury for the penalty phase).

Prior-murder convictions are relevant to the determination of the appropriate sentence because the sentencing phase focuses in part on the character of the defendant. The guilt phase, however, is limited to a determination of what the defendant did. *See United States v. Myers,* 550 *F.*2d 1036, 1044 (5th Cir.1977) ("A concomitant of the presumption of innocence is that a defendant must be tried for what he did, not who he is."), *cert. denied,* 439 *U.S.* 847, 99 *S.Ct.* 147, 58 *L.Ed.*2d 149 (1978). Because of the prejudice that could be engendered by *voir dire* prior to the guilt phase about a defendant's other murder convictions that are not otherwise admissible as evidence dur-

ing that portion of the case, see *Evid.R.* 55, that questioning should almost invariably come only after a jury has found a defendant death eligible. See *Pinnell, supra,* 311 *Or.* at 121, 806 *P.*2d at 116 (finding that "objective of a bifurcated trial was thwarted" by *voir dire* before guilt phase that "implied that defendant had previously been convicted of other crimes").

—D—

## OTHER ISSUES

Because the case must be remanded for a new sentencing proceeding, we address only those remaining issues that may arise on remand.

1. Mitigating Factor c(5)(h)

Before the sentencing proceeding, defense counsel requested that several factors relating to sympathy and to Biegenwald's personal history and prior sentences be charged separately to the jury. At the pre-sentencing hearing counsel expanded the request to include listing the factors individually on the special verdict form. Defense counsel argued that in adopting *N.J.S.A.* 2C:11-3c(5)(h) (c(5)(h)) (mitigating factors include "[a]ny other factor which is relevant to the defendant's character or record or to the circumstances of the offense"), the Legislature intended that if the evidence established multiple non-specific-statutory factors, they should be presented to the jury individually rather than merely as evidence of one catch-all factor. Counsel asserted that in order to ensure fair consideration of non-specific-statutory mitigating factors, the factors should be listed on the jury-verdict sheet. According to defense counsel, to require jurors to remember the other factors would be to trivialize those factors, particularly in light of the listing of statutory aggravating and mitigating factors. On appeal defendant presses further, arguing that relegating to secondary consideration the other factors submitted pursuant to

c(5)(h) contravenes the United States Supreme Court's mandate that

> the Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering *as a mitigating factor,* any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death. [*Lockett v. Ohio,* 438 *U.S.* 586, 604, 98 *S.Ct.* 2954, 2964, 57 *L.Ed.*2d 973, 990 (1978); *accord Boyde v. California,* 494 *U.S.* 370, 110 *S.Ct.* 1190, 108 *L.Ed.*2d 316 (1990); *id.* at ——, 110 *S.Ct.* at 1201, 108 *L.Ed.*2d at 333 (Marshall, J., dissenting) (indicating unanimity on the ruling in *Lockett*); *State v. Ramseur, supra,* 106 *N.J.* at 294–95, 524 *A.*2d 188.]

The State did not oppose generally charging or listing the requested factors individually, although it objected to one proposed factor on the basis of relevance. The State did voice concern, however, that if the court were to list the factors requested by defense counsel, the jury might conclude that those were the only factors to be considered and would "totally disregard something that neither defense counsel nor the court had considered as a mitigating factor." *Expressio unus est exclusio alterius.* The court, citing the concern raised by the State, denied the request to list the proffered factors separately but indicated that it would allow defense counsel to point out the factors in his summation. The court also indicated that in charging the jury on c(5)(h), it would mention the evidence tending to support the defense's argument.

We have long recognized, as has the Supreme Court, that "above all, capital sentencing must be reliable, accurate, and nonarbitrary." *Saffle v. Parks,* 494 *U.S.* 484, ——, 110 *S.Ct.* 1257, 1262, 108 *L.Ed.*2d 415, 427 (1990); *accord Gregg v. Georgia,* 428 *U.S.* 153, 96 *S.Ct.* 2909, 49 *L.Ed.*2d 859 (1976).

> [D]ecisions to impose the death sentence [must] be consistent (in the sense of consistency with other decisions to impose or not to impose death) and * * * reliable (in the sense that the individual defendant is deserving of the punishment). Sometimes conflicting, the two principles of consistency and reliability reflect the increased demands of accuracy and fairness, rising to constitutional dimension, in the implementation of this unique criminal sanction. [*Ramseur, supra,* 106 *N.J.* at 185, 524 *A.*2d 188.]

Consistent procedural treatment of mitigating factors in capital-sentencing proceedings advances those interests of fairness,

reliability, and justice. We are aware that in at least one other capital-murder prosecution, non-specific-statutory mitigating factors proffered by the defendant were listed on the jury-verdict form. (The jury sentenced that defendant to life imprisonment with a thirty-year period of parole ineligibility.) Any other factor "relevant to the defendant's character or record or to the circumstances of the offense," *N.J.S.A.* 2C:11–3c(5)(h), that a defendant submits for consideration and that could be established by some reliable evidence, *see N.J.S.A.* 2C:11–3c(2), should be listed on the jury-verdict form. That does not mean that every factor proffered by a defendant must be listed. See *State v. Gerald, supra,* 113 *N.J.* at 103, 549 *A.*2d 792 (sentence of co-defendant inadmissible); *Bey* II, *supra,* 112 *N.J.* at 146, 548 *A.*2d 887 (evidence of general non-deterrent effect of death penalty inadmissible). The trial court must evaluate the factors offered by a defendant in accordance with the language of c(5)(h).

The State argues that were a court to list non-specific-statutory mitigating factors on a defendant's request, jurors might conclude that they would be precluded from finding and giving effect to mitigating factors not listed, possibly thereby violating *Lockett.* That contention is without merit for at least two reasons. First, we are not persuaded that a procedure that permits a defendant to itemize for the jury those mitigating factors on which he or she relies possibly violates *Lockett.* Furthermore, and perhaps more importantly, listing non-specific-statutory mitigating factors does not diminish the trial court's responsibility to inform the jury how mitigating evidence may affect its decision. The jurors must be told that the list of mitigating factors is non-exclusive and that mitigating factors other than those listed may be found and considered whether or not non-specific-statutory mitigating factors are listed on the jury verdict form. *California v. Brown,* 479 *U.S.* 538, 545, 107 *S.Ct.* 837, 841, 93 *L.Ed.*2d 934, 942 (1987) (O'Connor, J., concurring) ("the jury instructions—taken as a whole—must clearly inform the jur[ors] that they are to consider any

relevant mitigating evidence about a defendant's background and character"); *Bey* II, *supra*, 112 *N.J.* at 169, 548 *A.*2d 887 ("The requirement that capital sentencing must not preclude consideration of relevant mitigating circumstances would be hollow without an explanation of how the evidence can mitigate the imposition of the death penalty."). *See generally Judges Bench Manual for Capital Cases* XXXI.C., at 141–42 (1990) (same).

The State's less-paternalistic arguments that listing of non-specific-statutory mitigating factors is not required are equally unpersuasive. The contention that listing separate factors under c(5)(h) will lead to impermissible double counting of mitigating factors has been addressed previously. See *State v. Pennington, supra,* 119 *N.J.* at 599, 575 *A.*2d 816 ("The court should instruct the jury that the same evidence may be used to prove multiple mitigating factors."). Furthermore, the treatment of aggravating factors—*e.g.,* limiting possible aggravating factors to those enumerated in *N.J.S.A.* 2C:11–3c(4), considering multiple murder convictions as evidence of only one aggravating factor—is not relevant to the treatment of mitigating factors, nor can it be. Jurors *must* be permitted to consider and give effect to *any* mitigating evidence. Conversely, sentencers are strictly limited in their deliberations to consideration of only those aggravating factors set forth in *N.J.S.A.* 2C:11–3c(4).

Common sense compels the determination that when evidence of wholly-unrelated circumstances is offered pursuant to c(5)(h), it is not intended to be considered as a single factor by the sentencer. The language of the provision is too broad to permit a contrary conclusion. For example, a defendant could offer evidence of a violent and abusive childhood, of his or her potential for rehabilitation, and of specific past acts of discrimination against the defendant. To consider that evidence as probative of only one factor is not only illogical but also runs afoul of the requirement that mitigating circumstances receive individualized consideration. See *Bey* II, *supra,* 112 *N.J.* at

161, 548 *A*.2d 887. Each circumstance must be presented to the jury, with the determination of the weight to be accorded it left for the jury after proper instruction from the court.

Turning to the specific factors requested by defendant prior to the resentencing proceeding, all but one meet the relevance requirements of c(5)(h). The request relating to sentences imposed on defendant after other murder convictions raises the specter that a jury in this case may be unduly influenced by the determination of another jury made on a substantially different record. Because the sentencing determination is fact specific and remains subject to significant sentencer discretion, the sentence imposed in another case under different circumstances has little probative value to the present jury's sentencing decision. A properly-impanelled jury in a capital case is aware of the limited options available in sentencing a defendant convicted of murder. Furthermore, the argument that defendant will never be eligible for parole in his lifetime can be made based on the current proceeding. Evidence of sentences imposed on defendant for his other murder convictions should not be admitted.

2. Failure to define murder

Defendant contends that the trial court's failure to define murder for the jury at any time constituted plain error and violated his constitutional right to due process of law and to a reliable sentencing determination. Defendant argues that because "the jury here sentenced defendant for the crime of murder, and based its decision on two prior murder convictions, without knowing the legal definition of murder," its determination is suspect. Beyond the impact that absence of a definition of murder may have had on the *voir dire*, see *supra* at 41–42, 594 *A*.2d at 193–194, the failure to define murder, if error, was harmless. The determination to be made here was the appropriate sentence, not whether Biegenwald was guilty of murder. The jury was aware of the circumstances of the underlying

killing and knew that those circumstances had caused another jury to find defendant guilty of murder. Because the jury was neither required nor permitted to reconsider whether defendant was guilty but rather was charged only with determining the appropriate sentence, a definition of murder should not have changed its deliberative process.

Although educating potential jurors on what constitutes murder was necessary for the court and counsel to conduct an effective *voir dire* (because the common "it depends on the circumstances" answer to the question about a venireperson's views on the appropriateness of the death penalty is unintelligible in the absence of a clear understanding by that venireperson of the limited circumstances under which the death penalty may be imposed), see *supra* at 41–42, 594 *A.*2d at 193–194, a definition of murder is not essential to the sentencing deliberation. We agree with the conclusion of the Trial Judges Committee on Capital Causes that the prior-murder-conviction aggravating factor, *N.J.S.A.* 2C:11–3c(4)(a), "does not appear to require further definition." *Judges Bench Manual for Capital Cases, supra,* Appendix J, at J(2)–13; *cf. State v. Clausell,* 121 *N.J.* 298, 344, 580 *A.*2d 221 (1990) (court on remand should define aspects of aggravating factors that are not substantially self-explanatory). The jury is not permitted to second-guess the judgment of a prior jury that has convicted a defendant of murder; it need know only that defendant has committed another murder. The murder statute specifies the evidence admissible to prove that factor:

> Evidence offered by the State with regard to the establishment of a prior homicide conviction [in fact, only a prior *murder* conviction is admissible as an aggravating factor under c(4)(a) ] pursuant to paragraph (4)(a) of * * * subsection [c] may include the identity and age of the victim, the manner of death and the relationship, if any, of the victim to the defendant. [*N.J.S.A.* 2C:11–3c(2)(f).]

A detailed understanding of the murder statute is not necessary either to a jury's determination of the existence of the c(4)(a) factor or to its weighing of that factor in the ultimate decision on the appropriate sentence. The understanding of

"murder" as used in our statute will be adequately conveyed by the trial court during *voir dire*, the underlying trial, or both. Because we reverse on other grounds, we need not decide whether this jury's understanding of "murder" was adequate for it to deliberate effectively.

3. Removal of Intoxication from Mitigating Factor c(5)(d) Instructions

 Defendant's Notice of Mitigating Factors included notice that should a capital-sentencing proceeding be necessary, he would seek to prove that

> defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was significantly impaired as the result of mental disease or defect or intoxication. [*N.J.S.A.* 2C:11-3c(5)(d).]

During the sentencing proceeding defense counsel elicited testimony on cross-examination of Smith tending to establish that defendant had been smoking marijuana on the night of the murder:

> Q You recall having a conversation, don't you, at some time when Mr. Biegenwald told you he was in the car that night and smoking pot with the girl?
> A Yes.

To emphasize that testimony, defense counsel returned to the subject as the final question:

> Q You do recall him saying he had smoked pot in the particular car where you found the blood stains with the girl?
> A Yes.

In his summation, defense counsel reminded the jury that Smith had testified to defendant's smoking marijuana on the night of the murder. The summation, however, made no explicit attempt to develop that fact as a mitigating factor. Rather, defense counsel's reference to defendant's drug use appeared to focus on a motive for the killing—namely, to prevent the victim from reporting defendant's drug use (a violation of his parole) to the police—and thereby to refute aggravating factor c(4)(c).

In the general, introductory jury charge, the court had listed all eight possible mitigating factors. At that point, in reading c(5)(d) to the jury, the court mentioned that that factor included intoxication as possibly impairing defendant's mental capacity. However, when the court narrowed its discussion to the mitigating factors actually advanced by defendant in the resentencing proceeding, it deliberately omitted reference to intoxication, both when reading c(5)(d) again to the jury and when explaining that factor.

Defendant took timely exception to the court's omission of intoxication in its explanation of c(5)(d). The court refused to amend the instruction:

MR. DIAMOND: Your Honor, please the Court, with the addition that the legislature put in as to intoxication at the time of the offense was committed, could you instruct the jury intoxication also includes the use of drugs such as marihuana?

THE COURT: No, I won't.

MR. DIAMOND: That's what the legislature intended.

THE COURT: I won't instruct them.

MR. DIAMOND: There is testimony at the time the offense was committed.

THE COURT: Your position is clear, I'm not going to instruct them on intoxication.

No further explanation for the court's decision is evidenced in the record. The verdict sheet also omitted "intoxication" from the c(5)(d) factor.

Defendant claims that the trial court's refusal to include reference to intoxication in its instruction on mitigating factor c(5)(d) precluded the jury from considering and giving effect to mitigating evidence and therefore requires vacating of the death sentence. The State contends that the trial court did not err because there was *no* evidence of intoxication. The State further contends that the jury was not precluded from considering defendant's marijuana usage on the night of the murder under mitigating factor c(5)(h), the catch-all factor.

Defendant correctly points out that the eighth amendment "requires that juries be given instructions which allow them to 'consider and give effect to [the] mitigating evidence,'" quoting

*Penry v. Lynaugh,* 492 *U.S.* 302, 314, 109 *S.Ct.* 2934, 2944, 106 *L.Ed.*2d 256, 275 (1989). This Court has indicated previously that juries must be allowed to consider all mitigating circumstances advanced by defendant at trial. *Bey* II, *supra,* 112 *N.J.* at 169, 548 *A.*2d 887. Defendant emphasizes that he is not suggesting that the evidence of intoxication would have constituted a defense to prosecution, but rather that the evidence supported a charge on intoxication as a mitigating factor under c(5)(d).

That the trial court omitted intoxication from its charge on c(5)(d) and left intoxication out of the recitation of that factor on the verdict sheet is troubling, particularly because the trial court read the language of the provision—including the reference to intoxication—to the jury in its initial overview of the statute but thereafter gave no explanation for its failure to have included intoxication in its specific charge and on the verdict sheet. The statute plainly includes intoxication in its c(5)(d) language. That intoxication can derive from drug or alcohol usage is recognized generally. *E.g., State v. Zola,* 112 *N.J.* 384, 424, 548 *A.*2d 1022 (1988); *N.J.S.A.* 2C:2–8e(1) (defining intoxication as "a disturbance of mental or physical capacities resulting from the introduction of substances into the body").

In *Zola,* we held that the trial court had not erred in denying a request that the jury be instructed on the defense of intoxication. 112 *N.J.* at 425, 548 *A.*2d 1022. We reasoned that "intoxication may be attributed to drugs * * * but must cause 'prostration of faculties' to be considered relevant to negating an element of the offense." *Id.* at 424, 548 *A.*2d 1022 (citation omitted) (quoting *State v. Cameron,* 104 *N.J.* 42, 54, 514 *A.*2d 1302 (1986)). Because the trial court had "found no reliable evidence of ingestion of drugs or alcohol, much less any incapacitation of judgment due to use [of] such substances," *ibid.,* we concurred with the decision not to charge intoxication *as a defense to capital murder.*

Whether the refusal of the court below to instruct the jury on intoxication constituted significant error we need not decide, because we vacate defendant's sentence on other grounds. However, we do note that the standards for admissibility and consideration of intoxication during a capital-sentencing proceeding are not the same as the comparable standards applicable during the determination of guilt. *See N.J.S.A.* 2C:11–3c(2)(a) ("defendant shall have the burden of producing evidence of the existence of any mitigating factors * * * but shall not have a burden with regard to the establishment of a mitigating factor"); –3c(2)(b) ("defendant may offer, without regard to the rules governing the admission of evidence at criminal trials, reliable evidence relevant to any of the mitigating factors"); –3c(5)(d) (defendant's capacity impaired as the result of "intoxication, but not to a degree sufficient to constitute a defense to prosecution"); *cf. Smith v. State,* 492 *So.*2d 1063, 1067 (Fla.1986) ("some evidence, however slight, that Smith had smoked marijuana the night of the murder" held "sufficient to justify giving instructions for reduced capacity and extreme emotional disturbance" in capital-sentencing proceeding); *State v. Goodman,* 298 *N.C.* 1, 32, 257 *S.E.*2d 569, 589 (1979) ("[w]hen the defendant contends that his faculties were impaired by intoxication, such intoxication must be to a degree that it affects defendant's ability to understand and control his actions"); *State v. Bellamy,* 293 *S.C.* 103, 105, 359 *S.E.*2d 63, 65 (1987) ("if there is evidence that the defendant could be under the influence of alcohol or drugs," court should charge on mitigating circumstances relating to reduced capacity).

### 4. Use of the Videotape of Dr. Eshkenazi

Defendant contends that he was denied due process of law when he was forced to use at the resentencing proceeding a five-year-old videotape of testimony of a psychiatric expert witness made during the original sentencing proceeding. According to defendant, the denial of public funds for a psychiat-

ric expert witness before the trial in 1983 denied him the essentials of a minimally-adequate defense at the resentencing proceeding in 1989. The mere statement of that contention manifests its dubious credibility.

The court's refusal to provide public funds for an expert witness at the time of Biegenwald's trial was not clearly erroneous. There was no showing that defendant was indigent, a prerequisite to any entitlement to public funds for legal services. Moreover, the denial of public funds is irrelevant on the issue of due process because defendant had the benefit of psychiatric testimony from an expert witness. We are unmoved by defendant's contention that the denial of public funds before his trial in 1983 "forced defense counsel into a position where he either had to rely on a videotape or pay for an expert out of his own pocket" during the new sentencing proceeding in 1989.

5. Ineffective Assistance of Counsel

■ Biegenwald argues that counsel's decision to use the five-year-old videotape constitutes ineffective assistance of counsel because by its use counsel (1) waived the only defense to aggravating factor c(4)(c) ("depravity of mind"); (2) waived the opportunity to present testimony without regard to the rules of evidence as permitted by a 1985 amendment to *N.J.S.A.* 2C:11–3c(2)(b), *see L.*1985, *c.* 178; and (3) introduced an improper reference by the prosecutor to defendant's exercise of fifth- and sixth-amendment rights. Those contentions have some theoretical appeal. We note, however, that in the prosecution for the murder of William Ward, the only evidence introduced by defense counsel during that capital-sentencing proceeding was the same videotaped testimony of Dr. Eshkenazi at issue here, and there the jury spared defendant's life.

The standard for considering an ineffective-assistance-of-counsel claim is that "if counsel's performance has been so deficient as to create a reasonable probability that these defi-

ciencies materially contributed to defendant's conviction, the constitution will have been violated." *State v. Fritz, supra,* 105 *N.J.* at 58, 519 *A.*2d 336; *see State v. Davis, supra,* 116 *N.J.* at 356, 561 *A.*2d 1082 (holding same standard applies in capital cases). That standard was adopted substantially unchanged from the standard announced by the Supreme Court in *Strickland v. Washington, supra,* 466 *U.S.* 668, 104 *S.Ct.* 2052, 80 *L.Ed.*2d 674, and *United States v. Cronic,* 466 *U.S.* 648, 104 *S.Ct.* 2039, 80 *L.Ed.*2d 657 (1984).

Counsel's conduct does not clearly rise to that level. In matters of trial strategy, we accord great deference to the decisions of counsel:

With hindsight, it is not difficult to suggest different trial strategies that counsel might have pursued, but the law is settled that "[i]n assessing the adequacy of counsel's performance, 'strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable.'" *Burger v. Kemp,* 483 *U.S.* 776, 819 [107 *S.Ct.* 3114, 3139], 97 *L.Ed.*2d 638, 673 (1987) (Powell, J., dissenting) (quoting *Strickland, supra,* 466 *U.S.* at 690, 104 *S.Ct.* at 2066, 80 *L.Ed.*2d at 695). [*State v. Marshall, supra,* 123 *N.J.* at 165, 586 *A.*2d 85.]

Defendant does not contend that the decision to use the videotape was not a product of a thorough investigation of the circumstances and consideration of options in preparation for the resentencing proceeding, notwithstanding the conclusory statement that counsel was "forced" by financial considerations to use the tape. The record, moreover, does not indicate the extent of counsel's investigation and planning, if any, in preparation for that proceeding. Under the circumstances, defendant's ineffective-assistance-of-counsel claim based on the decision to use the videotape must be denied because defendant has not identified the deficiencies that materially contributed to his sentence. See *State v. Fritz, supra,* 105 *N.J.* at 58, 519 *A.*2d 336.

6. Aggravating Factor c(4)(c) ("depravity of mind")

▮ Defendant contends that application of that portion of c(4)(c) relating to depravity of mind, as construed by this Court in *State v. Ramseur, supra,* 106 *N.J.* at 197–211, 524 *A.*2d 188,

violates the due-process clause of the fourteenth amendment of the United States Constitution. *Cf. Bouie v. City of Columbia,* 378 *U.S.* 347, 353–54, 84 *S.Ct.* 1697, 1702–03, 12 *L.Ed.*2d 894, 900 (1964) ("If a state legislature is barred by the Ex Post Facto Clause from passing such a law, it must follow that a State Supreme Court is barred by the Due Process Clause from achieving precisely the same result by judicial construction."). Defendant argues that based on the .decision in *Godfrey v. Georgia,* 446 *U.S.* 420, 100 *S.Ct.* 1759, 64 *L.Ed.*2d 398 (1980) (Georgia provision on which c(4)(c) is modeled held unconstitutionally vague in absence of limiting construction), "Biegenwald could have reasonably believed that this factor did not apply to his case because the victim's death was instantaneous; there was no serious physical abuse prior to death as required by the Georgia limiting construction." According to defendant, application of c(4)(c) as construed in *Ramseur, supra,* 106 *N.J.* at 208–11, 524 *A.*2d 188, violates the principle underlying the ex post facto clause that "persons have a right to fair warning of that conduct which will give rise to criminal penalties." *Marks v. United States,* 430 *U.S.* 188, 191, 97 *S.Ct.* 990, 992, 51 *L.Ed.*2d 260, 265 (1977).

Were the "depravity of mind" portion of c(4)(c) the only aggravating factor on which the State relied in seeking imposition of the death penalty at the resentencing proceeding, defendant's claim might present a more difficult question. However, any requirement of notice to this defendant that his conduct could produce a capital verdict was clearly fulfilled by other provisions of the murder statute, specifically the other-murder-conviction aggravating factor. See *N.J.S.A.* 2C:11–3c(4)(a). Consequently, even though we acknowledge that the construction of c(4)(c) adopted by this Court in *Ramseur, supra,* 106 *N.J.* at 208–11, 524 *A.*2d 188, is a "broader interpretation," *id.* at 205, 524 *A.*2d 188, than that approved in *Godfrey,* its application to defendant did not violate the due-process clause because it neither punishes as a crime an act lawful when committed, "makes more burdensome punishment for a crime

after its commission, [nor] deprives one charged with crime of any defense available according to law at the time when the act was committed." *Beazell v. Ohio,* 269 *U.S.* 167, 169, 46 *S.Ct.* 68, 69, 70 *L.Ed.* 216, 217 (1925); *see also Dobbert v. Florida,* 432 *U.S.* 282, 292, 97 S.Ct. 2290, 2297, 53 *L.Ed.*2d 344, 356 (1977) (quoting *Beazell*).

## III

## CONCLUSION

Defendant's death sentence is vacated, and the case is remanded to the Law Division for a resentencing proceeding consistent with this opinion.

HANDLER, J., concurring.

The Court vacates defendant's death sentence and remands for resentencing. It bases its reversal on the inadequacy of the *voir dire* and expresses disapproval of the trial court's refusal to list separately for the jury the mitigating factors under the catch-all factor, *N.J.S.A.* 2C:11-3(c)(5)(h) (c(5)(h)). I agree that the inadequate *voir dire* here requires reversal, and would add that failure to list separately the mitigating factors under c(5)(h) independently requires reversal. However, unlike the plurality, I would state specifically that individual listing of mitigating factors under c(5)(h) is constitutionally required. I would further base reversal of this sentence in part on the trial court's failure to instruct the jury on intoxication during the penalty phase. In addition, I continue to believe that our death-penalty statute is unconstitutional as enacted, interpreted, and applied, *see, e.g., State v. Marshall,* 123 *N.J.* 1, 214–15, 586 *A.*2d 85 (1991) (Handler, J., dissenting); *State v. Bey,* 112 *N.J.* 123, 188–90, 548 *A.*2d 887 (1988) (Handler, J., dissenting), thus providing further grounds for vacating this death sentence.

## I

One additional issue, brushed aside by the Court, merits attention and serves as an independent ground for reversal. Defense counsel's actions at trial—particularly his dehumanizing presentation of defendant during summation and his reliance on a five-year-old videotape for key mitigating evidence—deprived defendant of the effective assistance of counsel.

## A

During his summation, defense counsel repeatedly argued that the jury should vote to spare defendant's life so that medical research could be performed on defendant in an effort to develop a cure for anti-social personality disorder with paranoid traits. At one point he urged:

Suppose, if he [defendant] lives, he's studied and this is the person here that produces that miracle drug for adults. This is society's chance to do that, by keeping him alive, not by killing him. What do we gain by killing him? If we can keep him alive and study him, right, he is the opidimy [sic] of the person who should be kept alive.... You are never going to find a better subject person and you are never going to find I submit to you a subject person who has had records going back to 1963, that they can use, clinically, to study him with.... If he had AIDS, and he could have the cure for AIDS in his body, would you kill him?.... [W]ould anybody here hesitate to say ... save him, keep him alive as long as you can. What's the difference?

Counsel returned to that theme throughout the summation. Perhaps most astonishingly, counsel concluded thusly:

I tell you this, you have a human life here, *a life that has had no value up until this day*, but it's still a human life.... But more importantly than that, you have a human life that may save many other lives. (Emphasis added.)

A defense lawyer's function at the sentencing phase is to create a portrait of the defendant that convinces the jury that defendant deserves to live. *State v. Oglesby*, 122 *N.J.* 522, 545, 585 *A.*2d 916 (1991) (Handler, J., concurring). I believe that counsel here betrayed his function by characterizing defendant as someone completely devoid of worth as a human being. Counsel's summation dehumanized defendant, essentially portraying him as lacking any human virtue and inviting the jury to view defendant as a guinea pig, his only socially acceptable state. In so doing, counsel distanced himself from his client,

communicating to the jury the irremediable repugnance of
defendant. He conceded that defendant did not deserve the
jury's sympathy. To the extent that counsel had theretofore
presented a meritorious case in mitigation, that case was shat-
tered when counsel acknowledged that defendant did not de-
serve to live.

The summation constituted a complete capitulation to the
State's position. It conceded that defendant did not deserve to
live, but urged the jury to spare him to use for the benefit of
others. The Supreme Court's recent capital punishment juris-
prudence has striven to develop "a system of capital punish-
ment at once consistent and principled but also humane and
sensible to the uniqueness of the individual." *Eddings v.
Oklahoma*, 455 *U.S.* 104, 110, 102 *S.Ct.* 869, 874, 71 *L.Ed.*2d 1,
8 (1982). "[T]he fundamental respect for humanity underlying
the Eighth Amendment ... requires consideration of the char-
acter and record of the individual offender and the circum-
stances of the particular offense as a constitutionally indispens-
able part of the process of inflicting the penalty of death."
*Woodson v. North Carolina*, 428 *U.S.* 280, 304, 96 *S.Ct.* 2978,
2991, 49 *L.Ed.*2d 944, 961 (1976) (citation omitted). Defense
counsel repudiated that "fundamental respect for humanity"
and denied the "uniqueness" of defendant in his summation.

In addition, defense counsel's presentation was irresponsible
and arbitrary. Even if he legitimately could have argued that
defendant's life should be spared so that he could serve as a
testing ground for an experimental drug, there was absolutely
no factual basis to support that argument. There was no
testimony that any drug had been or could have been developed
to treat defendant's disorder; there was no evidence that defen-
dant would consent to such testing or could be compelled to
submit to it; and there was no evidence that the State would
condone such experimentation or would use defendant for such
undefined research. The risk that defense counsel's bizarre
theory would strike the jury as pure conjecture, if not wholly
ridiculous, cannot be discounted. An attorney who treats his

client's life as a mockery cannot expect a jury to treat it with dignity.

In *State v. Fritz*, 105 *N.J.* 42, 519 *A.*2d 336 (1987), this Court adopted, with slight modification, the standard for determining ineffective assistance of counsel established by the Supreme Court in *Strickland v. Washington*, 466 *U.S.* 668, 104 *S.Ct.* 2052, 80 *L.Ed.*2d 674 (1984), and *United States v. Cronic*, 466 *U.S.* 648, 104 *S.Ct.* 2039, 80 *L.Ed.*2d 657 (1984). This Court held that "a criminal defendant is entitled to the assistance of reasonably competent counsel, and that if counsel's perform-ance has been so deficient as to create a reasonable probability that these deficiencies materially contributed to defendant's conviction, the constitutional right will have been violated." *Fritz, supra,* 105 *N.J.* at 58, 519 *A.*2d 336.

I have urged this Court to adopt more stringent standards of review of attorney competence in capital cases. *See, e.g., State v. Oglesby, supra,* 122 *N.J.* at 543–45, 585 *A.*2d 916 (Handler, J., concurring); *State v. Savage,* 120 *N.J.* 594, 644–47, 577 *A.*2d 455 (1990) (Handler, J., concurring in part and dissenting in part); *State v. Davis,* 116 *N.J.* 341, 402–13, 561 *A.*2d 1082 (1989) (Handler, J., dissenting in part and concurring in part). I need not restate that position. Even under the Court's lenient *Strickland–Fritz* standard, however, defense counsel's conduct indisputably rose to the level of ineffective assistance of coun-sel. He denied that his client had intrinsic dignity as a human being. See Handler, *Individual Worth,* 17 *Hofstra L.Rev.* 493 (1989). He utterly dehumanized his client, thereby effectively abandoning him. He may well have convinced the jury that defendant had no worth as a human being and deserved to die, precisely the opposite of what capital counsel are duty bound to do. There can be no doubt that defendant suffered prejudice because of his attorney's devastating remarks.

### B

As noted by the Court, at resentencing defense counsel relied on a five-year-old videotape of testimony of a psychiatric expert

witness, Dr. Eshkenazi, made during the original sentencing trial. *Ante* at 54–57, 594 *A*.2d at 200–201. The majority concedes that defendant's arguments that reliance on this videotape constituted ineffective assistance of counsel "have some theoretical appeal." *Ante* at 55, 594 *A*.2d at 200.

Defense counsel's seeming decision to rely on the videotape, rather than conduct any new investigation in preparation for this retrial, deprived defendant of competent representation. Although defense counsel had used the videotape successfully in a previous capital trial for the murder of William Ward, that trial occurred five years before this sentencing proceeding, shortly after the original trial and sentencing in this case. Furthermore, although the videotape had been used successfully in the Ward trial, Eshkenazi's testimony had failed to persuade the jury in the first trial for the murder of Anna Olesiewicz.

Although whether counsel conducted any new investigation prior to the resentencing proceedings is unclear from the record, he indicated in papers submitted to the trial court before the proceeding that he planned to rely *solely* on the videotape. Defense counsel told the jury he was relying on the videotape for "expediency." There is no indication in the record, however, that defense counsel sought to arrange or change court dates so that Eshkenazi would be able to testify in person. Also, defense counsel never intimated prior to the resentencing that lack of funds had prevented him from calling Eshkenazi to testify in person, nor did counsel request prior to the resentencing that the trial court authorize payment for Eshkenazi as an expert witness. Indeed, defense counsel never challenged, prior to the subject proceeding, the earlier denial of State funds for a psychiatric evaluation. *See Ake v. Oklahoma,* 470 *U.S.* 68, 105 *S.Ct.* 1087, 84 *L.Ed.*2d 53 (1985) (if sanity is likely to be significant issue at trial, State must provide defendant with access to psychiatrist if defendant cannot afford one).

As a consequence, there is no evidence that defense counsel investigated or determined prior to resentencing whether a new psychiatric evaluation, either by Eshkenazi or by some other expert, would benefit defendant's sentencing defense. The inference arises that defense counsel did not make any effort to uncover new evidence or "update" existing evidence of defendant's psychiatric condition at the time of the crime.

That defense counsel made no effort to investigate the possibility of other mitigating factors, or to develop any other evidence of mitigating factors or evidence to counter the State's alleged aggravating factors, also seems apparent. The record reveals nothing defense counsel did to mount a defense to the death sentence, except to rely on the videotape. That is inexcusable. *See State v. Savage, supra,* 120 *N.J.* at 626, 577 *A.*2d 455 ("if defense counsel had presented additional information at the penalty phase regarding defendant's mental state, there is a reasonable probability that a jury" would not have imposed the death penalty); *id.* at 643, 577 *A.*2d 455 (Handler, J., concurring in part and dissenting in part) ("total forfeiture" in "preparation and presentation" of defendant's case in mitigation constituted ineffective assistance). Defense counsel, knowing the videotape was five years old, should have sought other witnesses, particularly to establish the existence of the catch-all factor, c(5)(h).

The Court adheres to a two-pronged test for ineffective assistance.

First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable. [*Strickland v. Washington, supra,* 466 *U.S.* at 687, 104 *S.Ct.* at 2064, 80 *L.Ed.*2d at 693.]

That defense counsel had priorities other than his client is very clear. He sought to proceed quickly with the case.[1] For one, he intimated that he was impatient with the *voir dire* because he was not getting paid. He also declined the opportunity to edit the videotape in order to remove indications that the tape was old. Defense counsel instead told the court, "Just let it fly." Many of counsel's decisions seem to have been hasty and impatient even though the court did not apply any pressure to accelerate the proceedings. I can see no tactical advantage in the decision to use a stale videotape in a death-penalty case. Defense counsel himself described the decision as *expedient*. That failure to prepare adequately for the resentencing denied defendant the effective assistance of counsel.

---

[1] In *voir dire*, defense counsel declined to employ a struck jury system, even though the trial court went out of its way to make clear to defense counsel that the court would gladly use the struck jury system and that the court was in no hurry.

THE COURT: Mr. Diamond?

MR. DIAMOND: I won't have any objection to voting on these jurors right now and see what we end up with. We may not have to go through 45. Seem to be moving a lot better than we did in the previous trial.

Why should we go through 45 people for another week when we might have the first 14 or 15?

THE COURT: Why don't we go through this morning and then if you want to try it that way, I'll do that intermediate way of doing it, sure, because if we go through this morning we'll probably have about 20 people or so, I would guess, we have how many now, 13, 14 qualified.

Now, I don't think there's any sense in starting now because you know, just one is going to make us go through the process again. Are you in a rush?

MR. DIAMOND: Rush?

THE COURT: Are you in a rush?

MR. DIAMOND: I can't see interviewing 45 people, the first 20 will do it.

THE COURT: That means you are in a rush.

MR. DIAMOND: I would like to get started, I don't think we're going to need that many jurors.

MR. DIAMOND: He'd like to stay here forever.

(Laughter).

THE COURT: I know it will take 14 plus 20 plus 12 and I know I have got a solid jury.

MR. DIAMOND: I don't think it's going to take that many.

## II

I concur in the vacating of defendant's sentence of death.

GARIBALDI, J., dissenting.

Today the Court vacates the death sentence of Richard Biegenwald for the murder of Anna Olesewicz and remands for yet another penalty-phase proceeding. The majority concludes that the jury *voir dire* was constitutionally deficient. I disagree. I conclude that the overall *voir dire* was adequate and that the defendant received his constitutional due: a fair and impartial jury. Accordingly, I dissent from the majority's ruling and would affirm the defendant's sentence of death.

## I

### Overall Voir Dire

The purpose of *voir dire* is the creation of an impartial jury. *State v. Williams*, 113 *N.J.* 393, 409–10, 550 *A.*2d 1172 (1988) (*Williams* II); *State v. Biegenwald*, 106 *N.J.* 13, 29, 524 *A.*2d 130 (1987). The test for determining if one may serve as a juror in capital cases is whether the prospective juror's opinions, be they for or against the death penalty, would " 'prevent or substantially impair the performance of his duties in accordance with his instructions and his oath.' " *State v. Bey*, 112 *N.J.* 123, 151, 548 *A.*2d 887 (1988) (quoting *Adams v. Texas*, 448 *U.S.* 38, 45, 100 *S.Ct.* 2521, 2526, 65 *L.Ed.*2d 581, 589 (1980)); *see also State v. Ramseur*, 106 *N.J.* 123, 255, 524 *A.*2d 188 (1987) (quoting same). " 'The quest is for jurors who will conscientiously apply the law and find the facts.' " *State v. Koedatich*, 112 *N.J.* 225, 293, 548 *A.*2d 939 (1988) (quoting *Wainwright v. Witt*, 469 *U.S.* 412, 423, 105 *S.Ct.* 844, 851, 83 *L.Ed.*2d 841, 851 (1985)), *cert. denied*, 488 *U.S.* 1017, 109 *S.Ct.* 813, 102 *L.Ed.*2d 803 (1989). The examination of each juror's views on capital punishment, however, must be sufficiently probing to assure compliance with the governing legal standards and to expose potential bias. *State v. Perry*, 124 *N.J.*

128, 155, 590 *A*.2d 624 (1991); *State v. Hunt,* 115 *N.J.* 330, 354, 558 *A*.2d 1259 (1989).

Determining whether a *voir dire* is adequate requires an examination of the entire record. It is a fact-sensitive task. As this Court has previously recognized, the *voir dire* process frequently takes on a "rhythm of its own." *State v. Dixon,* 125 *N.J.* 223, 244, 593 *A*.2d 266, 276 (1991); *State v. Moore,* 122 *N.J.* 420, 447, 585 *A*.2d 864 (1991). Each judge conducts *voir dire* in his or her own way. The creation of an impartial jury, through the process of *voir dire,* follows "no particular tests" and "is not chained to any ancient and artificial formula." *United States v. Woods,* 299 *U.S.* 123, 145–46, 57 *S.Ct.* 177, 185, 81 *L.Ed.* 78, 88 (1936); *see also Mu'Min v. Virginia,* —— *U.S.* ——, ——, 111 *S.Ct.* 1899, 1917, 114 *L.Ed.*2d 493 (1991) (Kennedy, J., dissenting) (noting that "[t]here is no single way to *voir dire* a juror" and that he "would not limit the trial judge's wide discretion to determine the appropriate form and content of *voir dire* questioning"). Because an assessment of an individual juror's impartiality rests on a close personal examination, this Court has accorded trial courts great deference in conducting *voir dire. State v. Koedatich, supra,* 112 *N.J.* at 275, 548 *A*.2d 939; *see also State v. Jackson,* 43 *N.J.* 148, 160, 203 *A*.2d 1 (1964) ("The trial court is vested with broad discretionary powers in determining the qualifications of jurors. * * * [I]ts exercise of discretion will ordinarily not be disturbed on appeal."), *cert. denied,* 379 *U.S.* 982, 85 *S.Ct.* 690, 13 *L.Ed.*2d 572 (1965). In *State v. Singletary,* 80 *N.J.* 55, 402 *A*.2d 203 (1979), we set forth the rationale underlying that rule of deference:

Decisions concerning the potential bias of prospective jurors are primarily subjective in nature. They require at bottom a judgment concerning the juror's credibility as he responds to questions designed to detect whether he is able to sit as a fair and impartial trier of fact. Consequently, such evaluations are necessarily dependent upon an observation of the juror's demeanor during the course of *voir dire*—observations which an appellate court is precluded from making.

&ast; &ast; &ast; &ast; &ast; &ast; &ast; &ast;

Although a juror's professions of impartiality will not always insulate him from excusal for cause, *see, e.g., State v. Jackson, supra; State v. Deatore,* [70 *N.J.* 100, 358 *A.*2d 163 (1976)], they will be accorded a great deal of weight, *see, e.g., State v. Grillo,* [16 *N.J.* 103, 106 *A.*2d 294 (1954)]; *State v. Jefferson,* 131 *N.J.L.* 70, 72 [34 *A.*2d 881] (E & A 1943). Inasmuch as the trial judge observed the venireman's demeanor, he was in a position to accurately assess the sincerity and credibility of such statements, and we should therefore pay due deference to his evaluation. [*Id.* 80 *N.J.* at 63, 64, 402 *A.*2d 203.]

In *State v. Biegenwald, supra,* 106 *N.J.* at 35–37, 524 *A.*2d 130, and *State v. Ramseur, supra,* 106 *N.J.* at 256–57, 524 *A.*2d 188, this Court reaffirmed its special deference to the trial court in reviewing *voir dire.* "A sensitive weighing and appraisal of a juror's entire response must be made by the trial court in its duty to resolve the question of whether the juror has shown bias or prejudgment." *State v. Ramseur, supra,* 106 *N.J.* at 257, 524 *A.*2d 188. Except in the rarest of circumstances, appellate judges should follow the prudent course of deferring to the court that was in the position to make such a close, personal inspection. *State v. Williams, supra,* 113 *N.J.* at 411, 550 *A.*2d 1172; *see also Wainwright v. Witt, supra,* 469 *U.S.* at 425–26, 105 *S.Ct.* at 852–53, 83 *L.Ed.*2d at 852–53 (noting that deference should be given to trial court decisions because "there will be situations where the trial judge is left with the definite impression" regarding a prospective juror despite a "lack of clarity in the printed record"); *State v. Hunt, supra,* 115 *N.J.* at 357, 558 *A.*2d 1259 (noting "sound measure of discretion" given to trial judges).

We measure the adequacy of the trial court's inspection of prospective jurors by its character and tone, not by any one question of the court or one response of a venireperson. *State v. Zola,* 112 *N.J.* 384, 397, 548 *A.*2d 1022 (1988); *State v. Ramseur, supra,* 106 *N.J.* at 256–57, 524 *A.*2d 188. Unlike the majority, after reading this "unanimated" record, I find that the *voir dire* as a whole was sufficiently probing to weed out any prospective jurors whose ability to decide defendant's correct sentence was impaired.

The *voir dire* spanned three days. The trial court took numerous precautions in conducting the *voir dire.* All prospective jurors completed a questionnaire. The questionnaire contained general questions concerning the juror's age, marital status, age and sex of children, occupation, physical condition, familiarity with defendant, the prospective witnesses, and the lawyers in the case, whether the juror or a member of his or her family or a close friend was employed in law enforcement, had ever been charged with a criminal violation or had ever been the victim of a crime. Each potential juror also was asked whether he or she had heard of a murder case involving defendant from any source and whether they had discussed defendant with anyone. Finally, each juror was requested to disclose any personal bias or prejudice that they believed would disqualify them from serving as a juror.

As each prospective juror was questioned individually, the court reviewed his or her questionnaire and inquired about any answer that raised a concern. For example, if the prospective juror was a young woman or had young women family members, the court would ask whether that fact would create a bias against a defendant convicted of murdering a young woman. Invariably the court· also asked each venireperson if he or she had any preconceived bias or prejudice against psychiatric testimony.

The trial court's general instruction to the potential jurors set the tenor of the *voir dire* early in the proceeding.

> The point [is] that you have to evaluate yourselves, the judge will explain the case to you, introduce the various people connected with it and you have to listen and say would I then able to be fair and impartial and objective on that case? Could I be open minded? Could I listen to all the witnesses and listen to the judge and then call it fairly?
>
> And if you think yes, fine, sit there, *but if someplace along the line you get the idea that gee, maybe I oughtn't be a juror* on this case for whatever reason, * * *
>
> [w]ell, that's okay. Everybody is entitled to their opinion ... [but] *the juror should not just forget about the law when they are sitting deciding the case.* The jurors take an oath to observe the law, to follow the law. *But if you ever got yourself in a situation like that where you are a prospective juror and*

*you have strong feelings, okay.* You are entitled to the feelings, but *you should not sit as a juror on that particular case.* That's all we try to do in the jury selection.

 &#42; &#42; &#42; &#42; &#42;. &#42; &#42; &#42;

I want to assure you that *there are no things such as the right answers* or the wrong answers *to the questions that we put,* either the written questions or the oral questions. *All we want are honest answers.* You know we're not trying to measure you to somebody's standards. Try to give us an honest evaluation of yourself and that's all we ask.

By the same token, if for some reason you should kind of fudge an answer on the questionnaire or fail to answer a question you really ought to answer, that would not be the right thing, we need that openness, frank response, because otherwise if you conceal something, it could result in a terrible miscarriage of justice which nobody wants. [Emphasis added.]

That instruction went beyond dispelling the notion that there were any "right" answers. See *State v. Dixon, supra,* 125 *N.J.* at 246, 593 *A.*2d at 277. It impressed on jurors that they should report anything possibly compromising their duty or oath directly to the judge, regardless of when it occurred. On the morning of closing arguments, the following occurred:

(The following was recorded in chambers.)

THE COURT: You have asked to talk with me, we will just make a record of it so we know what's going on?

A JUROR: Right. This weekend, I found out something I didn't know.

THE COURT: Yes?

THE JUROR: My husband's brother who I have never met, never seen, who I don't consider family, he's in Trenton State Prison, which I wasn't aware of.

THE COURT: Would that affect you as a juror?

THE JUROR: Well, no, I was thinking, I don't want to cause a mistrial.

THE COURT: Well, don't worry about that. But you didn't know this man at all, your husband's brother, you never met him?

THE JUROR: No.

THE COURT: So all you have learned over the weekend is information he's in Trenton State Prison?

THE JUROR: Right, he called Friday night.

THE COURT: When he called, did he have a specific message for your husband?

THE JUROR: No.

THE COURT: And your husband didn't say anything to you more than that?

THE JUROR: More than how are you doing?

THE COURT: What did your husband say to you about his telephone conversation with his brother?

THE JUROR: Nothing, he told me Tommy had called.

THE COURT: But how did you discover somebody was his brother then?

THE JUROR: He told me, I knew his brother was in jail, I didn't know where or why or anything, and—

THE COURT: Okay. Don't get nervous, I understand where you are, that's all. You knew your husband had a brother who was kind of a ne-er-do-well, criminal of some sort in jail someplace?

THE JUROR: Yes.

THE COURT: Up until the weekend you didn't know where. You tell me the only additional bit of information you got was—where was it, Trenton State Prison?

THE JUROR: Right.

THE COURT: Now, I'm asking you, bottom line, is that going to affect you somehow, that knowledge now, affect you somehow in deciding this case?

THE JUROR: No, I don't see why it would.

THE COURT: You are the only one who can tell me?

THE JUROR: No, doesn't make any difference to me.

THE COURT: Okay. Do me a favor, go back to the jury room. Don't mention anything to the jurors about what we have talked about here. Sit tight, I'll be talking to the lawyers. If they have a problem I'll let you know. But thank you very much for letting me know.

(The juror leaves the chambers)

THE COURT: On the record, with the counsel in chambers here. Mrs. Robinson indicated to the Court officers this morning that she wanted to speak with me and I brought her in here with the reporter and I asked her what she wanted [to] talk about and she said this: That she didn't know up until Friday night that her husband's brother was an inmate in the State prison.

She did know before Friday that her husband had a brother who was kind of a ne'er-do-well and was in jail someplace. She has never met the brother, never talked to the brother, but Friday night the brother called her and said, "Hi, how are you?" And the husband indicated to her and all he indicated to her was "That's my brother calling from the State prison."

I asked her on the record, "Do you think that would somehow affect your judgment here as a juror?" And she said, "No, I don't know why it would." I said, "Okay. Go back in the jury room, I'll talk to the lawyers and if they have a problem we'll be in touch with you further." That's where we are.

MR. DIAMOND: I have no problems with that.

MR. FAGEN: Well, I sure would have liked to ask her more questions.

THE COURT: I'll bring her in if you want more questions.

MR. FAGEN: Well I may give it some thought?

THE COURT: Okay, I'm not rushing.

THE COURT: I have asked Mr. Fagen whether he would like to question the juror further and he said—

MR. FAGEN: No.

THE COURT: And I understand it's satisfactory to both sides to allow her to continue?

MR. DIAMOND: Yes.

Alternate Juror Robinson's concerns and behavior exhibit a juror educated to the solemnity of her task and recognizing the on-going need to assure not only fairness and impartiality but the appearance of fairness and impartiality.

Only by reading the entire *voir dire* can an appellate court ascertain whether the trial court's *voir dire* is adequate. The questioning of venirepersons Zetkulic, Sacchi, and Chang impresses me as indicative of the character of the overall *voir dire*. The persistence of the court in unearthing potential prejudice and in allowing, indeed forcing, jurors "to air their views on the death penalty" in their own words, *State v. Hunt, supra,* 115 *N.J.* at 354, 558 *A.*2d 1259, demonstrates the adequacy of that court's inquiries.

Q Mr. Zetkulic, the answers you gave us on this questionnaire are the truth I take it?

A Yes, sir.

Q You have lived in Monmouth County a long time now, you indicate that you have served as a juror during that long time that you have lived here?

A Yes I do.

Q How long ago was that?

A A round three years ago, your Honor.

Q Here at the Courthouse?

A Yes.

Q Do you recall what kind of cases you may have sat on as a juror?

A The one I sat on?

Q What kind of case was it?

A It was criminal charge of rape.

Q Did you go all the way through to a verdict?

A Yes.

Q Anything about that experience sitting as a juror on that case, any impressions you may have formed which you feel might affect you in one way or another sitting as a juror on this case?

A No, I don't think so, sir.

Q There is a difference, obviously, with a rape case, sometimes you may have strong feeling about the process or something of that nature as the result of your service, you don't have those very strong feelings?

A No, sir.

Q You did check off the fact that you have heard of Mr. Biegenwald, and that you read of a case involving him?

A I read it at the time of the case, I read the newspaper about it, but as I indicated, I didn't discuss it or anything, I really forgot.

Q What do you remember about reading, that's the next question?

A Hardly anything, sir.

Q Well, what do you remember reading?

A That it was quite a—what shall I say—sensational, you know, just—

Q Aside from the fact it may have made headlines, what content do you recall, what facts?

A I recall something about, maybe I mixed it with something else, something like it was in the parking lot or something like that, if this is the one, I don't know, but that's all.

Q You recall something about a parking lot?

A Yes, sir, I couldn't say I did not hear of it.

Q *Okay, that's fair. What we're trying to figure out is what might be still in the back of your head?*

A Hardly anything, your Honor, because I don't recall fully what it was all about.

Q All right. Are you saying that if you should sit as a juror on this case in that jury box, that you would decide the question of what the proper penalty is based solely upon what you hear in this Courtroom?

A I believe so, yes.

Q And whatever it is, that faint memory you have, you will put that aside, is that what you are saying?

A Yes, I think I would.

Q *We're asking—we wouldn't want a faint memory to blossom out to be big and affect your decision in this case?*

A I understand.

Q You don't think that would?

A No, I don't think so.

Q One of the possibilities, and there are only two, is the death penalty. What are your views concerning the death penalty?

A I have no firm conviction either way, I think that I'm not against it and I'm not totally for it. I would be for it in certain circumstances.

Q Okay. So depending upon the circumstances?

A Yes, sir.

Q Well, that's another way of saying depending upon the good things and the bad things that are revealed to you in the courtroom?

A I would say so.

Q *I don't want to put words in your mouth, that's what you are saying?*

A I would think I would have to find in my own mind whether it's justified.

Q But it's depending upon how things come out, you could go either for the death penalty if you think it's right or for life imprisonment with no parole for 30 years?

A I think I could, yes, sir.

Q Some of the testimony as I indicated this morning will be psychiatric testimony which will be given to us by Dr. Eshkenazi.

Do you think there's anything about psychiatric testimony just as such that would make you feel you might not listen to it or sort of poo-poo it or put it aside?

A No, I have no feeling about it at all.

Q One way or the other?

A Yes, sir.

Q Are you saying you would listen to it?

A I would listen to it and judge it on its merits, sir.

\* \* \* \* \* \* \* \*

THE COURT: Mr. Zetkulic, thank you, take a seat in the jury room there and don't engage in any discussion with the jurors who are ahead of you in this case, if you want to talk about the weather or sports, it's all right.

A Thank you, sir. [Emphasis added.]

The trial court, influenced perhaps by the tone of the responses or the demeanor of the responder, asked follow-up questions regarding the possible effect of prior jury service, knowledge of the Biegenwald case, the death penalty, and psychiatric testimony. Those questions were neither close-ended nor suggestive. Furthermore, even if they could have been misunderstood to be so, the court dissipated the effect of that misunderstanding by stating that it did not "want to put words in [the venireperson's] mouth."

The *voir dire* of venireperson Sacchi also demonstrates the patient probing that characterized much of the *voir dire*.

Q You did say that either you personally or some member of your family was the victim of a crime?

A Yes.

Q What was that about?

A It was an assault.

Q Who?

A My mother.

Q How long ago was that?

A Approximately two years ago, she answered the door to her house and she was accosted at gun point.

\* \* \* \* \* \* \* \*

Q Did they find the person who did it?

A They did, and I believe he was convicted, yes.

Q Is there anything about your mother's experience which certainly was a terrifying one, that has affected you to the point where it may influence your judgment some how or other here?

A It has in a way because it was an emotional experience. I was upstairs at the time and I wasn't aware of what was going on downstairs. So I felt I could have done something, quite a duress for my mother.

Q But you understand that was a separate incident?

A Yes.

Q You think the memory of it would linger onto the point where when you came to decide what the appropriate penalty is in this case, it might affect you in coming to that decision?

A I can't be sure of that because—

Q Well, nobody can be sure. *We're trying to probe you?*

A Yes, I understand.

Q You understand how this case will work?

A Basically.

Q Okay. Because what will happen, so you are clear, is that there will be information presented to you, evidence as to what they call aggravating factors and mitigating factors, and in shorthand form the aggravating factors are the minuses if you will, mitigating factors are the pluses insofar as the death penalty is concerned.

And then at the end of that presentation I'll explain the law that applies to the jurors when they come to do the weighing of those pluses and minuses. Do you think that you would be able to listen to the law as I explain it, accept that, then make your own independent evaluation of the evidence that's given to you and then come to a conscientious decision as to which penalty is the right one without being influenced by your mother's experience?

A I would hope that I would be—I think I can do that, yes.

Q You have served as a juror before yourself?

A Yes.

Q When was that?

A Must have been about four years ago in Bergen County, Hackensack.

Q Remember what kind of case it was?

A Vandalism.

Q Anything about that experience as a juror or anything about what you heard during that case which again you feel would affect your judgments as a juror if you are sitting here?

A I don't think so in that case, no.

\* \* \* \* \* \* \* \*

Q One of the witnesses who will testify as I indicated to the jurors is a Dr. Eshkenazi. Dr. Eshkenazi is a psychiatrist. Do you have any pre-conceived notions about the value of psychiatric testimony?

A My own personal feelings about psychiatry can be—I feel it can be misleading in some respects, I don't think so—it can be misleading in my own opinion.

Q Well, maybe it can be in the hands of some psychiatrists. The question is here, you'll see Dr. Eshkenazi, you will listen to him, do you think that you'll be able to decide whether his testimony is valuable testimony to you in deciding what the appropriate penalty should be or will you just say okay, here comes another psychiatrist and forget about paying any attention to him?

A Well, I'm a law man, I don't know, it would probably lay with the rest of the evidence, I don't know where it is.

Q You can talk about any kind of medical man or professional man and there are good and bad in any profession.

A Yes.

Q You wouldn't take it—*you tell me if I'm wrong*—you wouldn't just simply backhand psychiatric testimony and say forget about it?

A No I certainly wouldn't.

Q And as to the death penalty, what is your view of that?

A That it could be appropriate or not appropriate. I'm—my feeling is yes, I do believe.

Q Yes what?

A I'm for that.

Q For it all the time?

A I feel that—well, it's hard to answer because—how can I say it, I don't know if you can rephrase that. I mean—

Q *I'm not trying to prompt you* but we're trying to—

A *I'm trying to give you the right answer.*

Q *There's no right answer. Give me the answer from the heart?*

A Could you tell me—

Q What do you think about the death penalty?

A I think it's right.

Q In all cases, that was my follow up question, all the time?

A Oh, I'm sorry, no I guess there's—

Q In other words, Mr. Biegenwald is sitting there as a murderer. Are you going to say you get the death penalty without going any further?

A No, it wouldn't be fair.

Q Of course it wouldn't be. Might you be doing that?

A No, not consciously I wouldn't do that. I would tend to be fair about it judgment wise in my own, if that answers your question.

Q *Well, see, there is no answer that you have to please me with, we just want to know —*

A I didn't know how to phrase it really, it's a little—

Q Well, pluses and minuses, good and bad, weighing of good and bad always indicates the possibility you could go one way or another. I'm not so sure that possibility exists for you.

A I had some very strong feelings about the death penalty, being more sort of proper in that respect. That's my honest opinion.

THE COURT: Any other questions?

MR. DIAMOND: Could we have a brief side bar?

THE COURT: Sure.

(The following was recorded at sidebar.)

THE COURT: I'm inclined to excuse him for cause.

The Court excused Sacchi for cause.

The *voir dire* of Sacchi captures the trial court's approach and attitude for *voir dire*. "We're trying to probe you," "you tell me if I'm wrong," "I'm not trying to prompt you," "there's no right answer," "[g]ive the answer from your heart," and "there is no answer that you have to please me with" illustrate the court's willingness to delve deeply when it believed a venireperson was less than forthcoming. See *State v. Dixon, supra,* 125 *N.J.* at 246, 593 *A.*2d at 277. The court's directness is refreshing because "plain speaking is the best way to get at such predisposition." *State v. Moore, supra,* 122 *N.J.* at 445–46, 585 *A.*2d 864.

Typical also of the openness of the trial court's questioning regarding a juror's views on the death penalty is the following exchange between the court and potential juror Chang:

Q Since the death penalty is a possible choice we would like to know what are your views on the death penalty?

A Well, I really don't know what to make of it, really, yet, because I never have to go through that myself. And as far as I see about the death penalty, it has some good points and some bad points, a good point is that for one thing, the taxpayers won't have to spend the money to support the criminal. And the bad thing is that you can always encounter the fact a person could be innocent and in killing that person. So by doing that you yourself are a criminal.

Q I didn't hear that, by doing what?

A By doing that incorrectly you yourself are the criminal.

Q Aha. Well, okay, how would that affect you, you are entitled to those views, how would that affect you if you were selected as a juror?

A I would feel bad if I didn't do the best I could, I do the best I can based on what the evidence shows me, if I did bad, I didn't make a good choice, then I would feel bad.

Q Well, I'm sure anybody would. But with all those feelings that you have now, how would that react on your ability to sit as a juror?

A Whatever I do, I do according to what's presented to me and if I made that choice, I made it because that was what was presented to me.

Q Are you saying that you want to be sure?

A Yes, I want to be sure I make the right choice, if I made that choice because I did it when I thought about it, not because I just did it hastily.

Q You understand this not flipping a coin.

A Yes, you are putting a person in line.

Q In line with those views you have expressed, do you believe if you sat there now, imagine you are sitting there, there will be evidence presented to you on what are called these aggravating factors and there will be evidence presented to you on mitigating factors. Do you think you'd be able to listen to both of them and sift through them and evaluate them and come to a decision based upon the law as I'll explain it to you?

A Yes, I could do it.

 * * * * * * * *

Before ending Ms. Chang's *voir dire* the court asked, as it almost invariably did, "[a]ny additional questions?" The following dialogue then took place.

MR. DIAMOND: Yes, your Honor. I believe Miss Chang stated one of the problems she had with the death penalty was the alternative of the State having to take care of the person, the cost factor.

THE COURT: Yes.

MR. DIAMOND: The two alternates, one is death or the State taking care of this person for the rest of his life, would that affect your decision, the cost factor.

THE COURT: As a taxpayer, would you think to yourself that I'm a taxpayer paying for this and therefore I will vote for the death penalty and not—

MR. DIAMOND: In other words would you rather kill him than feed him?

THE COURT: Let her answer my question first?

A. Well, I don't see the money anyway, I wouldn't even know exactly if that person has been supported by my taxes.

THE COURT: Is that going to be in your mind when you are deciding as to whether to impose the death penalty or not?

A No, what would be in my mind is, should that person deserve death or life, that's all, and whatever is presented to me, I really don't even know if it's going to make any difference in paying him because it's not going to matter, maybe a couple of cents.

Q You are not going to be thinking dollars and cents?

A No, of course not. I wouldn't be, it's just whether the person is going to live or going to die, simple as that, but I'm not going to think of anything else, money doesn't really make a whole lot of difference if a person—

THE COURT: Bottom line value is human life?

A. Right.

Ms. Chang's *voir dire* was then concluded.

Each of the foregoing examples (*voir dire* of Zetkulic, Sacchi, and Chang as well as the general instruction) combines with the admittedly-proper *voir dire* of venireperson Russo to demonstrate the overall sufficiency of the *voir dire*.

The majority points to the *voir dire* of juror Mitchell to provide "a sense of the court's approach to death qualification." *Ante* at 36–37, 594 *A*.2d at 190. However, the majority ignores Mitchell's actual responses and does not consider the effect of the non- or extra-verbal modes of communication and observation that give trial courts an overwhelming advantage over appellate courts in assessing the character of a venireperson's responses.

> "We can profit from an occasional reminder of the limitations that our isolation from the courtroom imposes on a full appreciation of the trial dynamics. * * * A bloodless record conceals subtle nuances; although we cannot always sniff them out, they do not often escape detection by our trial judges."
>
> [*State v. Gilmore*, 103 *N.J.* 508, 547, 511 *A*.2d 1150 (1986) (Clifford, J., dissenting) (*quoted in State v. Ramseur, supra*, 106 *N.J.* at 260, 524 *A*.2d 188).]

Instead the majority focuses on an ensuing colloquy between counsel and the court, during which the court said of venireperson Mitchell's response, "You may not like that answer but it's absolutely the correct answer."

I agree with the majority's abstract point that "the suggestion in the colloquy that there is a 'correct' answer to the open-ended question 'what are your views on the death penalty?' is most troubling." *Ante* at 39, 594 *A*.2d at 192. If the record indicated any attempt by the trial court to condition, coerce, or predetermine a venireperson's response or to qualify an unqualified juror, I would agree with the majority. However, the majority's hyper-technical sensitivity confuses a shorthand, imprecise description used among learned participants, out of earshot of the jury panel, with an improper attempt to suggest or elicit an untruthful, less-than-honest "qualifying" response. *Cf. Wainwright v. Witt, supra*, 469 *U.S.* at 433–34, 105 *S.Ct.* at

856–57, 83 *L.Ed.*2d at 857 ("[r]elevant *voir dire* questions * * * need not be framed exclusively in the language of the controlling appellate division opinion; the opinion is, after all, an opinion and not an intricate devise in a will"). An imprecise description (that of calling a "qualifying" answer a "correct one") exchanged between officers of the court belies the repeated attempts here to elicit the actual, rather than the acceptable, beliefs of jurors.

This trial court conducted a *voir dire* that did, indeed, "draw out the potential juror's views, biases, and inclinations and [that] provide[d] both counsel and the court the opportunity to assess the venireperson's demeanor." *Ante* at 39, 594 *A.*2d at 192. The trial court certainly never exhibited an intent to elicit a "correct" answer. See *State v. Dixon, supra,* 125 *N.J.* at 246, 593 *A.*2d at 277 (*voir dire* questions "did not attempt to force the jurors into any mode"). In fact, the court specifically warned against any such notion. More importantly, by focusing only on the dialogue between the trial court and defense counsel after Mitchell's *voir dire* rather than on Mitchell's *voir dire* itself, the majority erroneously concludes that the *voir dire* of juror Mitchell is inadequate. I agree with the Court's observation that Mitchell's *voir dire* could have been more probing—indeed, I suspect the same could be said of any *voir dire. Cf. Mu'Min v. Virginia, supra,* —— *U.S.* at ——, 111 *S.Ct.* at 1904, 114 *L.Ed.*2d at 504 ("[t]o be constitutionally compelled, it is not enough that such questions might be helpful"). However, his *voir dire* certainly was adequate. *Ibid.; see also id.* at ——, 111 *S.Ct.* at 1909 (O'Connor, J., concurring) (that "the trial judge could have done more" does not automatically mean that a Sixth Amendment violation has occurred).

RANDALL MITCHELL, sworn.

EXAMINATION BY THE COURT:

Q Take a seat there, please. You tell us that you and your family have lived in Oceanport for two years, where did you live before Oceanport?

A Toms River before that and Bradley Beach before that.

Q Okay. You indicate that during some period of time you had heard of Richard Biegenwald. How did that occur?

A Just through the papers back at that time.

Q Back some years ago?

A Oh, yeah.

Q Do you recall what it was through the papers that you read back then?

A No, I have just read the name, having seen it in the papers.

Q In what context?

A In relation to some type of a trial or, you know, you have stories that you don't really know the contents about but you remember certain individuals that were involved, that's about it.

Q All right. When you say that's about it, is there any precise fact that you remember from that time or from whatever you read?

A Actually, no, it was just a name, familiarity only because I have lived in the county for a number of years.

Q None of your family members or you have ever been connected with police work or Prosecutor's office or anything of that nature I take it from your answers?

A Correct.

Q These answers are all true answers?

A Yes, sir.

Q You have never sat as a juror before?

A No, sir, I have not.

Q You work for Bridgewater Wholesalers and you are the manager of a wholesale—what is that?

A Well, it's basically building materials, wholesale.

Q Building materials wholesale?

A Right, up in Somerset County.

Q All right. And your wife is a dental office manager?

A Right.

Q You have some small children, you have a girl who is age 12 I see. The victim in this case, Anna Olesiewicz was a young female, there's anything about having a young daughter and a young female victim that you think is going to affect your decision if you should sit as a juror?

A No, I don't think so, primarily one of the reasons is my daughter doesn't live with me, she lives with the mother.

Q Well, all right, wherever she lives, the question is still the same?

A No, that doesn't seem to create a problem for me.

Q All right. The obligation of the jurors here in this trial is a limited one as I explained, has to do with which penalty is appropriate to this situation based upon aggravating factors that are presented and mitigating factors that are presented. Unless those words throw you, I don't think they should, but aggravating factors would be those things which would tend to lean you towards the death penalty, mitigating factors would tend to lean you away from

the death penalty and toward life imprisonment with no parole for 30 years, those are the two options?

A Yes.

Q Since death is a possible option, what do you think generally about the death penalty?

A It applies in certain cases and sometimes it doesn't, it's not something that I have taken a position on definitely, that it goes or doesn't go in cases.

Q There are some people conscientiously think the death penalty should never be imposed and they are entitled to that view. That's not your view?

A No.

Q There are also some folks who are more, if you will, hard-nosed and they would say if there is a murder involved whoever is convicted of that murder should get the same penalties, death penalty. Are you of that persuasion?

A No, I think you have to weigh each case by its merits.

Q Okay. Part of the evidence that will be presented to you is that of Dr. Eshkenazi, I mentioned his name yesterday, he's a psychiatrist. Anything about psychiatric testimony which you think is less worthy of acceptance than maybe other kind of medical testimony?

A No, sometimes, in some cases it's very valid.

Q At the end of the case after you have heard all the evidence on the aggravating and mitigating factors, I'll be explaining to all the jurors who sit how they should handle those and what principals of law apply to the decision. I tell you that your obligation under your oath is to accept the law as I explain it and not to substitute for it your own views as to what you think the law is or what it ought to be, you think you can do that?

A Yes, sir, I do.

Q Sitting there now and knowing it's important to all of us, you think that if you are selected as a juror on this case you would be able to sit, listen in that open minded way that I have described before, make your evaluation and then decide what is the appropriate penalty and do that fairly objectively and conscientiously?

A I believe so.

THE COURT: Any additional questions of the prospective juror? All right. Then thank you, Mr. Mitchell, will you take a seat in the jury room please, there are others there, don't discuss this case. Oh, one question I didn't ask. Yesterday I was very emphatic about not listening to anything, reading anything that has to do with this case. Now I understand there may have been something on T.V. last night, I understand there may have been something in the paper. Did you do any reading or listening?

A I chuckled only because I fell asleep last night.

Q All right. That's good, before you fell asleep did you see anything on T.V. and this morning did anybody have a newspaper you happened to see?

A No I brought some of my own paperwork.

THE COURT: Okay, bring your own paperwork, don't look at any newspapers.

MR. DIAMOND: Your Honor there is one question I had, on number 19, ever heard of a murder case involving—I believe the juror said he recalled the headline but not the facts, but here there is a specific mention he said yes to having heard of a murder case, his recollection then is of a murder and I would like to inquire of that.

THE COURT: Of the recollection that you said you had about Richard Biegenwald, was that in connection with the murder?

A Not really, no.

THE COURT: Well, that's what you checked here?

A It was—I tried to get that—I checked it only because I wanted to have an opportunity to explain it to you.

THE COURT: Okay, explain it?

A It was a situation, name association with a case that hit the papers, if you live in the area for a long enough period of time the name, oh yes, I remember that, but you'll not remember anything about it and that's basically what I was trying to say there, yes, I heard of it but nothing about it.

THE COURT: Of Richard Biegenwald in connection with murder?

A Of Richard Biegenwald but not with relation to any specific crime.

Q Generic crime of murder?

A What was the question, I'm sorry.

Q The question is, before coming here today had you ever heard of a murder case involving Richard Biegenwald from any source whatsoever, either today or at any time previously, Richard Biegenwald of a murder case involving Richard Biegenwald and you checked yes?

A Yes, I was under the impression the question was Mr. Biegenwald with reference to whatever the situation happened to be and you people more or less have identified what the crime had been.

Q Oh, because I said this is a murder case and you had heard Biegenwald and that's the association that made you check yes?

A Yes, sir.

THE COURT: All right. Thank you, same spot.

A Okay.

The *voir dire* of Mitchell, which the majority holds out as illustrative of some inadequacy, actually demonstrates the persistence and open-mindedness of this trial court. The court initially asked an open-ended question about the death penalty, five questions concerning previous knowledge of defendant, two questions related to the potential impact of the victim's status, and a question about the use and appraisal of psychiatric testimony. The trial court also responded positively to counsel's request for further inquiry and asked at least six more questions regarding Mitchell's prior knowledge of Biegen-

wald or his crimes. The *voir dire* of Mitchell exemplifies how this trial court, unlike the court in *Williams,* repeatedly asked the "follow-up questions requested by counsel in order to explain" previous answers. 113 *N.J.* at 420, 550 *A.*2d 1172.

Finally, the trial court's failure to pry into the terse responses of venireperson Black does not change my opinion that the general character of that *voir dire* was constitutionally-adequate. A host of reasons, not apparent from the written record, may have contributed to the court's acceptance of them without further inquiry. Defense counsel also declined to ask any further questions of this venireperson, apparently believing he had received enough information about her from her responses and demeanor during questioning. Such conduct by counsel strengthens my impression of the adequacy of this *voir dire. See State v. Zola, supra,* 112 *N.J.* at 396–97, 548 *A.*2d 1022.

This *voir dire* met every standard we have previously formulated and fulfilled the historic purpose of *voir dire.* Courts have long stated that *voir dire* is not a process of selection but one of rejection. *See Hayes v. Missouri,* 120 *U.S.* 68, 71, 7 *S.Ct.* 350, 351, 30 *L.Ed.* 578, 580 (1886); *State v. Moore, supra,* 122 *N.J.* at 454, 585 *A.*2d 864; *State v. Manley,* 54 *N.J.* 259, 280–81, 255 *A.*2d 193 (1969). In *State v. Manley,* we defined the purpose and scope of *voir dire,* noting that

counsel [had begun] to subvert the function which was to assist in the impaneling of an impartial jury by using it to educate the jury panel on the facts of a particular case, to prejudice the jury for or against a particular party, to argue the case, to indoctrinate the jury, to induce the jurors by use of the hypothetical questions or otherwise to commit themselves to vote in a particular way, or to instruct them in matters of law. [54 *N.J.* at 276, 255 *A.*2d 193.]

We went on to observe that "the impression is inescapable that the aim of counsel is no longer *exclusion* of unfit or partial or biased jurors. It has become the *selection* of a jury as favorable to the party's point of view as indoctrination through the medium of questions or assumed facts and rules of law can accomplish." *Id.* at 281, 255 *A.*2d 193. To remedy the situation this Court adopted *Rule* 1:8–3(a),

the basic intent of which was to have the voir dire conducted exclusively by or through the trial judges to the extent reasonably possible. * * * Of course supplementary questioning by counsel personally is not foreclosed entirely, but control over its scope and content is left to the experienced judgment and discretion of the trial judge to be exercised with the history and purpose of the rule in mind. [*Id.* at 282, 255 *A.*2d 193.]

The court's exercise of discretion in dealing with such requests is subject to reversal only on a showing of prejudice resulting from an abuse of that discretion. *See State v. Biegenwald, supra,* 106 *N.J.* at 27, 524 *A.*2d 130. The majority's view that "shopping," with its connotation of selection and post-comparison purchase, is a "permissible or appropriate," indeed "necessary," metaphor for the *voir dire* process, *see ante* at 32–33, 594 *A.*2d at 188, ignores the abuses, concerns, and solutions that have shaped the evolution of *voir dire.* Courts, along with counsel, are not consumers in the *voir dire* market, picking and choosing jurors who meet their personal tastes; they are only inspectors in that market, examining and testing venirepersons to ensure the creation of an impartial jury from those that remain.

The entire *voir dire* was more than sufficient to fulfill that goal. There was nothing "perfunctory" about the death-qualification process. *See State v. Williams, supra,* 113 *N.J.* at 408, 550 *A.*2d 1172. Moreover, for reasons stated more fully below, I believe that the trial court's failure (1) to define the crime of murder or (2) to ask venirepersons about the possible effect that evidence of Biegenwald's prior murder convictions would have on their decision-making process did not render this *voir dire* constitutionally deficient.

## II

### The Trial Court's Failure to Define
### Murder During Voir Dire

For the first time on appeal defendant raised the issue that failure to define the crime of murder denied defendant a fair and impartial jury. The trial court did not define murder for

prospective jurors because it was unnecessary. This jury did not have to determine whether Biegenwald had committed murder; that had already been determined. This jury's sole function was to determine the appropriate penalty. Failure to provide a legal definition on a tangential issue during *voir dire* is not "clearly capable of producing an unjust result." *State v. Hunt, supra,* 115 *N.J.* at 363, 558 *A.*2d 1259 (citing *R.* 1:7–2 and *R.* 2:10–2).

Defendant's reliance on *State v. Williams, supra,* 113 *N.J.* at 412 n. 5, 550 *A.*2d 1172, is misplaced for three reasons.

First, *Williams* was a case in which the same jury would be called on to decide the guilt/non-guilt issue *and* the life-imprisonment/death-penalty issue. Of course, "knowledge about what constitutes capital murder," *ibid.,* would have a place in such a pre-guilt setting. This jury never had a pre-guilt stage.

Second, this trial court in fact met the *Williams* command. "It would be helpful if the trial court provided the jurors with an outline of the State's death penalty statute." *Ibid.* The trial court gave, in its words, "a basic outline to them." It said that it was usually "done in a two-stage procedure." The court then continued:

This case is a murder case, but your task is somewhat unusual. It's a different kind of task that you'll be asked to perform.

 \* \* \* \* \* \* \* \*

The first stage before the jury is to determine whether or not the person who is accused of the crime is guilty of the crime of murder, the jury sits and decides whether the man is or woman is guilty or not guilty of murder. That's the first stage [in the typical case].

Then the legislature has said after that's finished, then there is a second proceeding, a second trial and the purpose of the second trial is to determine what the penalty is that should be imposed, the jury in New Jersey is the one that decides the penalty. And the options that the legislature has enacted in the law are two: The penalty, if somebody is convicted of murder the penalty is either death or the life imprisonment with no parole for at least 30 years. Those are the options.

Ultimately when a case is tried, it's tried to the same jury for the first part and for the second part. So the jury that heard all the evidence on whether or not the person is guilty of the crime, if it decides the person is guilty, then that

same jury sits and the case continues with the presentation of additional proofs which bear upon the jury's decision in the second part of the case, whether the man is to be penalized by death or penalized by life imprisonment with no parole for at least 30 years.

Of course if the jury in the first part of the case decides the person is not guilty, that's the end of it.

The proofs that are proffered in the second part of the case are proofs which bear upon what are called aggravating and mitigating factors. Common sense tells you the aggravating factors are those proofs which would cause you to kind of lean towards the death penalty. Mitigating factors are those factors which would cause you to lean towards life imprisonment with no parole for at least 30 years. Those are the proofs that are presented in the second part of the case.

And after those proofs are presented, then the jury deliberates as to what the penalty should be and it weighs and carefully considers those aggravating and mitigating factors under principles of law which the trial Judge explains to the jurors.

Now, the legislation, while it provides that usually the same jury takes care of both parts of the case also allows in specific cases for a different jury to be impaneled for the second part than that jury which heard the first part. And that's exactly what's happening here.

Richard Biegenwald has been convicted of murder, no question about that, he's guilty of murder. The question the jurors in this case will be deciding is what is the appropriate penalty of the two options which the legislature has provided. The jury we're going to select then will have to decide whether from all of the proofs that are [proffered] on these aggravating and mitigating factors and after weighing them in accordance with the law, will have to decide whether death is the appropriate penalty or rather whether the other appropriate penalty is life imprisonment with no possibility of parole for at least 30 years. This jury then we're going to pick is not going to be concerned at all with deciding whether the man was, should have been, or is not guilty. He is guilty. No question about that. And you don't have any concern over that. The jury that's going to decide this case will decide punishment or penalty.

Now, our purpose is to select from among you, jurors who will be able to fulfill that responsibility in a fair and impartial way. We will attempt to ascertain from each of you whether you think that you can do so by way of an inquiry which will involve, one, your preparation of answers to a written questionnaire that we'll distribute, that written questionnaire will ask questions about your background, things of that nature, and then we will, after you fill out the questionnaires, you'll come in individually and we will look at the answers to the questions and we'll ask you certain questions which will enable us, that means the Court and the lawyers involved, to get an idea of your background and your thinking, so that we can evaluate whether you ought to be able to be a fair and impartial juror on this case.

Because trial counsel asked for no more-elaborate definition of the issues before the jury, we appraise this issue under the

plain-error standard. An "outline" of this detail convinces me that the court's failure to adorn it further did not contribute to an unjust result. See *State v. Hunt, supra,* 115 *N.J.* at 350, 558 *A.2d* 1259. These jurors certainly had "some basic comprehension about what their legal duties as jurors would be." *State v. Moore, supra,* 122 *N.J.* at 446, 585 *A.2d* 864.

Finally, it is not at all clear that *Williams* itself would have held such a failure to be reversible error. *Williams* stated that "it would be helpful" for the trial court to provide such a definition. *Ibid. Williams* did not state or imply that failure to do so gave rise to a presumption or even an inference that jurors were confused or misinformed.

I am not convinced that either the facts of this case or the holding of *Williams* made defining murder during *voir dire* an absolute imperative. I am also not convinced that even if they did, this Court's instructions did not meet that standard. I am convinced, however, that the failure to define murder was not plain error.

### III

*The Trial Court's Refusal to Ask Jurors on Voir Dire How They Would React to Evidence of Aggravating Factor N.J.S.A. 2C:11–3c(4)(a)*

The trial court refused to ask prospective jurors whether they could consider evidence in mitigation once they heard evidence that Biegenwald had been convicted of murdering another person in addition to Anna Olesewicz. I believe that the trial court had the discretion to refuse to ask that question. I also believe that even if the court should have allowed the question, any resulting error was harmless. Hence, I must disagree with the majority.

### A

"Jurors must not be asked categorically to prejudge their willingness to impose the death penalty in the case." *State v.*

*Ramseur, supra,* 106 *N.J.* at 257, 524 *A.*2d 188. Here, the proffered question comes dangerously close to doing exactly that. Obviously defense counsel would have liked to know the answer to that question; undoubtedly he could have more intelligently made peremptory excusals if he could have forced a response to that question. Those two observations themselves do not create a constitutional command. *Mu'Min v. Virginia, supra,* —— *U.S.* at ——, 111 *S.Ct.* at 1904, 114 *L.Ed.*2d at 504. Moreover, the prospect of uniformly requiring such a question troubles me.

> The Constitution does not always entitle a defendant to have questions posed during *voir dire* specifically directed to matters that conceivably might prejudice veniremen against him. * * * Thus, the State's obligation to the defendant to impanel an impartial jury generally can be satisfied by less than an inquiry into a specific prejudice feared by the defendant. [*Ristaino v. Ross,* 424 *U.S.* 589, 594, 96 *S.Ct.* 1017, 1020, 47 *L.Ed.*2d 258, 263 (1976)].

As the United States Supreme Court has stated: "a prospective juror cannot be expected to say in advance of trial whether he would in fact vote for the extreme penalty in the case before him." *Witherspoon v. Illinois,* 391 *U.S.* 510, 522 n. 21, 88 *S.Ct.* 1770, 1777 n. 21, 20 *L.Ed.*2d 776, 785 n. 21 (1968). Whether to allow this inquiry on *voir dire* is, and should remain, within the sound discretion of the trial court. *State v. Hunt, supra,* 115 *N.J.* at 357, 558 *A.*2d 1259.

I remind the majority that "[t]he distinction between questions which ask jurors how they would decide issues of a case if and when such issues are presented and questions which merely inquire whether jurors can start the case without bias or prior inclination is not always crystal clear." *Waters v. State,* 248 *Ga.* 355, 363, 283 *S.E.*2d 238, 247 (1981). That is precisely why we accord a "sound measure of discretion" to trial judges in the conduct of *voir dire. State v. Hunt, supra,* 115 *N.J.* at 357, 558 *A.*2d 1259. The written record may not only " 'conceal[ ] subtle nuances,' " *State v. Ramseur, supra,* 106 *N.J.* at 260, 524 *A.*2d 188 (quoting *State v. Gilmore, supra,* 103 *N.J.* at 547, 511 *A.*2d 1150 (Clifford, J., dissenting)), but it may also permit overly-precise dictionary distinctions not appreciable in

the discourse of the trial. This trial judge, after lengthy consideration of draft questions proposed by defense counsel, the prosecutor, and himself, rejected inquiries on this subject because it asked "the ultimate question" in the case. His reasons, detailed and thorough, showed no abuse of discretion. They covered roughly twenty-six pages of transcript and all the relevant statements of this Court and clearly indicated careful consideration. Moreover, they accord with the decisions of other jurisdictions that have decided the issue. I find no abuse of discretion and would accord this trial court's well-reasoned, competent, and conscientious decision the deference it deserves.

Other states have voiced similar concerns and reached similar conclusions when faced with this issue. In *Godfrey v. Francis*, 251 *Ga.* 652, 308 *S.E.*2d 806 (1983), the Georgia Supreme Court considered the propriety of the following question in a capital-resentencing hearing:

Assume there's a murder, two murders with aggravating circumstances proved to your satisfaction, would you be * * * willing or able to consider a sentence less than death under those circumstances and follow the law that allows it. [*Id.* at 667, 308 *S.E.*2d at 819.]

It held that "the defendant cannot create error by eliciting responses to questions that solicit the juror's views on evidence not yet presented." *Ibid.* In this Georgia case even the dissent believed that mentioning "two murders" in the *voir dire* question was "possibly objectionable," noting that "questions incorporating facts yet to be proved are often quite improper." *Id.*, 308 *S.E.*2d at 822 (Gregory, J., dissenting). The Georgia Supreme Court has rejected similar questions in other cases. In *Castell v. State*, 250 *Ga.* 776, 783, 301 *S.E.*2d 234, 243 (1983), the court rejected certain *voir dire* questions in a capital case because they "might require [jurors] to prejudge the case." Similarly, in *State v. Waters, supra,* 248 *Ga.* at 363, 283 *S.E.*2d at 247, another capital case, the court held that "no question should require a response from a juror which might amount to prejudgment of the case." In all three cases the Georgia court carefully expressed its decision in terms (e.g., "might require")

that indicate its resolve to stay far clear of such areas on *voir dire.* Perhaps more importantly, the appellate court deferred to the sound discretion of the trial court in all three cases. *See Godfrey v. Francis, supra,* 251 *Ga.* at 667, 308 *S.E.*2d at 819; *Castell v. State, supra,* 250 *Ga.* at 783, 301 *S.E.*2d at 243; *State v. Waters, supra,* 248 *Ga.* at 363, 283 *S.E.*2d at 247.

The main thrust behind such resolve springs from a desire to avoid trying the case during *voir dire.* The jury should decide the ultimate issues of fact based on the evidence they all hear at trial, not the questions any one of them is asked on *voir dire.* "The parties are furnished the opportunity to make proper inquiry, but they are foreclosed from trying their cases at the time of *voir dire." State v. Jahnke,* 682 *P.*2d 991, 1003–1004 (Wyo.1984). Even where the question itself does not seek an immutable commitment from the juror, it can result in a similar dynamic. "The question was improper because it went to the ultimate issue of fact. * * * The question required the jury to speculate on evidence to be presented at trial. Furthermore, the question was designed to probe a juror's present impression of facts which were to be later developed at trial." *Reynolds v. Commonwealth,* 6 *Va.App.* 157, 367 *S.E.*2d 176, 183 (1986); *see also State v. Montez,* 309 *Or.* 564, 584, 789 *P.*2d 1352, 1366 (1990) (a question may be improper even if it only "asks the juror to comment in advance on how he would react to specific evidence"). I find these cases, along with those of Georgia, soundly reasoned, employing an analysis comparable to that used by the trial court here.

Today's majority believes that the question considered by the trial court merely sought to "inquire about the impact that knowledge of other murder convictions would have on the ability of prospective jurors to credit or consider evidence in mitigation." *Ante* at 34, 594 *A.*2d at 189. It views that question as reflecting a straight-edge distinction between responses that commit prospective jurors to *accept* a certain result and those that commit prospective jurors to *consider* a certain result. *Ante* at 34, 594 *A.*2d at 189. Although in the

proper case I agree that "an adequate *voir dire* should incorporate the suggestions of *Williams* II and *Moore*," *ibid.*, I do not believe the "suggestions" in those cases are applicable here. The accept/consider distinction often evaporates as a constraint on *voir dire* because it transforms the process into "the selection of a jury *as favorable to the party's point of view as indoctrination through the medium of questions or assumed facts and rules of law can accomplish.*" *State v. Manley, supra,* 54 *N.J.* at 281, 255 *A.*2d 193 (emphasis added). We have never sanctioned that as a legitimate aim of *voir dire. Voir dire* should produce neither a final verdict nor an arbiter's non-binding resolution.

Moreover, the majority also believes that it can merely interchange "another murder" for "rape" for the purpose of analysis under *State v. Williams, supra,* 113 *N.J.* 393, 550 *A.*2d 1172. *Ante* at 31, 594 *A.*2d at 187. It cannot. Although each establishes a statutory aggravating factor, the prior-murder factor is unique among the statutory aggravating factors. *State v. Biegenwald,* 110 *N.J.* 521, 538, 542 *A.*2d 442 (1988). The distinction between these two aggravating factors is more than semantic.

In *State v. Williams, supra,* 113 *N.J.* at 412–13 n. 5, 550 *A.*2d 1172, we approved of *voir dire* questions with "hypothetical examples to probe how various factors might affect a person's decision-making process" in the context of examining the effect of a victim's status or other non-statutory factors. We sought to ensure only that a jury remain focused on the defendant before it.

As this Court has stated,

the consideration of the individual characteristics of the offender and his crime is "a constitutionally indispensable part of the process of inflicting the penalty of death." *Woodson v. North Carolina,* 428 *U.S.* 280, 304, 96 *S.Ct.* 2978, 2991, 49 *L.Ed.*2d 944, 961 (1976); *see also Lockett v. Ohio,* 438 *U.S.* 586, 605, 98 *S.Ct.* 2954, 2965, 57 *L.Ed.*2d 973, 990 (1978) ("an individualized decision is essential in capital cases"). In sentencing, the jury must have before it all the possible relevant information "regarding the individual characteristics of the defendant and his offense, including the nature and circumstances of the crime and the

defendant's character, background, history, mental condition, and physical condition." *California v. Ramos,* 463 *U.S.* 992, 1006, 103 *S.Ct.* 3446 [3456] 77 *L.Ed.*2d 1171, 1184 (1983); *Jurek v. Texas,* 428 *U.S.* 262, 276, 96 *S.Ct.* 2950, 2958, 49 *L.Ed.*2d 929, 941 (1976).

In sentencing a defendant in a capital murder case, it is extremely important that the jury, in determining whether a defendant should receive the death penalty or life imprisonment, know that the defendant has previously been convicted of one or more murders. [*State v. Biegenwald, supra,* 110 *N.J.* at 538–39, 542 *A.*2d 442.]

Precisely because the determination of whether to inflict capital punishment on a given defendant is an *"individualized* decision," *Lockett, supra,* 438 *U.S.* at 605, 98 *S.Ct.* at 2965, 57 *L.Ed.*2d at 990, based on the "character of the individual and the circumstances of the crime," *Zant v. Stephens,* 462 *U.S.* 862, 879, 103 *S.Ct.* 2733, 2744, 77 *L.Ed.*2d 235, 251 (1983), we stated that

in accordance with our decisions in *Williams II, Long,* and *Zola, voir dire* should allow more open-ended questioning *on the issue of the status of the victims as it relates to any prejudice or predisposition affecting the juror's ability* to consider mitigating evidence in any penalty phase. [*State v. Moore, supra,* 122 *N.J.* at 451, 585 *A.*2d 864 (emphasis added).]

By going beyond that rationale in this case, the majority fundamentally recasts this Court's understanding of the goal of *voir dire* under the guise of applying established law.

Sympathy engendered by the victim's status must not infect the careful balancing of evidence " 'regarding the individual characteristics of the defendant and his offense.' " *State v. Biegenwald, supra,* 110 *N.J.* at 539, 542 *A.*2d 442 (quoting *California v. Ramos, supra,* 463 *U.S.* at 1006, 103 *S.Ct.* at 3456, 77 *L.Ed.*2d at 1189). Despite the United States Supreme Court's recent decision in *Payne v. Tennessee,* —— *U.S.* ——, 111 *S.Ct.* 2597, 115 *L.Ed.*2d 720 (1990), the propriety of introducing victim-impact evidence during any part of a capital case in New Jersey remains subject to the capital-sentencing jurisprudence of this state. *Payne* merely held that introducing victim-impact evidence is not a *per se* violation of the eighth amendment, and that state law may, but need not, allow the use of such evidence so long as such use conforms to the due process requirements of the federal constitution in any given

case. *Id.* at ——, 111 *S.Ct.* at 2608, 115 *L.Ed.*2d at 735. However, "the primary responsibility for defining crimes against state law [and] fixing punishments for the commission of these crimes * * * rests with States." *Ibid.* New Jersey has chosen, as it may under our constitutional system, *id.* at ——, 111 *S.Ct.* at 2609, 115 *L.Ed.*2d at 736, not to allow the introduction of victim-impact evidence unrelated to "the substantive issue of guilt or the penalty to be imposed." *State v. Williams, supra,* 113 *N.J.* at 452, 550 *A.*2d 1172; *see also State v. Clausell,* 121 *N.J.* 298, 341, 580 *A.*2d 221 (1990) (citing *Williams*); *State v. Pennington,* 119 *N.J.* 547, 566–67, 575 *A.*2d 816 (1990) (same).

*Voir dire* affords an important opportunity to inquire about potential victim-related biases. The questions suggested in *Moore* and *Williams* II involved cases in which a murder victim was raped or was a child or was the pregnant spouse of the defendant. A rape/murder is often, though not exclusively, a gynocide causing excessive, and deserved, sympathy for the victim. Likewise, infanticide, foeticide, and uxoricide have the potential to divert jurors from their duty to assess the defendant to their desire to avenge the victim. *Voir dire* questions, like this trial court's repeated inquiries regarding a venireperson's ability to decide after hearing evidence regarding the murder of a young woman, properly explore the effect of a victim's status on the prospective juror's decision-making process.

Although the presence of evidence relating to *N.J.S.A.* 2C:11–3c(4)(c) (murder involved torture or aggravated assault resulting in pain in addition to that necessary to cause death), c(4)(g) (murder involved other crimes, like rape, committed against this victim and/or other victims), or c(4)(h) (murder involved killing a public servant) may raise heightened concerns that demand further *voir dire* to establish that the victim's status will not prejudice the jury, the other aggravating factors simply do not raise those concerns. In *State v. Marshall,* 123 *N.J.* 1, 586 *A.*2d 85 (1991), we did not insist that *voir dire* examine the

impact of evidence on *N.J.S.A.* 2C:11–3c(4)(e) (murder involved paying another to kill). We have never suggested in any of our previous decisions in this case, see *State v. Biegenwald, supra,* 106 *N.J.* 13, 524 *A.*2d 130, and *State v. Biegenwald, supra,* 110 *N.J.* 521, 542 *A.*2d 442, that adequate *voir dire* must include questions on the impact of *N.J.S.A.* 2C:11–3c(4)(a) evidence. The difference between *Marshall* and the *Biegenwald* cases and those cases like *Moore* and *Williams* II is that the latter two contained evidence of aggravating factors that could easily be transformed from lenses through which the jury should examine the defendant into mirrors in which it saw the victim. When the reflection in such a mirror is not related directly to the circumstances of the crime, it has no place at trial and may be weeded out at *voir dire.* However, evidence of the c(4)(a) factor is non-reflective and could not implicate a victim's status in the way in which the facts and factors in *Moore* and *Williams* II could.

I have one further reason for disagreeing with the majority's insistence that this type of question is a required part of an adequate *voir dire.* This "question," if mandated in all future *voir dire,* promises to unravel much of the capital sentencing jurisprudence we have painstakingly developed. We have had to recast the New Jersey Capital Punishment Act numerous times to insure its constitutionally-satisfactory tone. *See State v. Marshall, supra,* 123 *N.J.* at 208, 586 *A.*2d 85 (O'Hern, J., concurring in part and dissenting in part). That has rightly resulted from the application of

our interpretative decisions in *State v. Biegenwald,* 106 *N.J.* 13, 524 *A.*2d 130 (1987); *State v. Ramseur,* 106 *N.J.* 123, 524 *A.*2d 188 (1987); *State v. Bey,* 112 *N.J.* 123, 548 *A.*2d 887 (1988) (*Bey* II); and *State v. Gerald,* 113 *N.J.* 40, 549 *A.*2d 792 (1988). We have had to reverse capital cases often for reasons with which the Legislature itself has concurred. *See, e.g., State v. Biegenwald, supra,* 106 *N.J.* 13, 524 *A.*2d 130 (burden is on State to prove beyond a reasonable doubt that aggravating factors outweigh mitigating factors before sentence of death may be imposed); *and see L.*1985, *c.* 178, § 2 (to the same effect); *State v. Bey,* 112 *N.J.* 45, 548 *A.*2d 846 (1988) (*Bey* I) (sentence of death may not be imposed on juvenile offender); *and see L.*1985, *c.* 478, § 1 (to the same effect). [*Ibid.*]

However, the death penalty cannot continue to serve its purpose, "consistent with our history and tradition," *id.* at 209, 586 *A.*2d 85 (O'Hern, J., concurring in part and dissenting in part), unless it operates actually, consistently, and fairly.

Today the majority undertakes an unnecessary recasting of the capital-punishment jurisprudence of this state. With but one exception, this Court professes "to believe that conscientious prosecutors and capable courts and counsel can fairly try capital cases." *Id.* at 208, 586 *A.*2d 85 (O'Hern, J., concurring in part and dissenting in part). This case was fairly tried, in keeping with our major interpretative statements as well as with the limited holdings of *State v. Moore, supra,* 122 *N.J.* 420, 585 *A.*2d 864, and *State v. Williams, supra,* 113 *N.J.* 393, 550 *A.*2d 1172. In insisting that it was not, the majority reaches well beyond established law in defining the requirements of what it understands as "fairness." That in itself is unfair and could lead to the perception of an inconsistent application of capital punishment because

[t]hese decisions do not justify today's decision. They merely prove how a hint becomes a suggestion, is loosely turned into dictum and finally elevated to a decision. [*United States v. Rabinowitz,* 339 *U.S.* 56, 75, 70 *S.Ct.* 430, 439, 94 *L.Ed.* 653, 665 (1950) (Frankfurter, J., dissenting).]

The majority's reliance on *Moore* and *Williams* II is a "progressive distortion," *ibid.*, that "giv[es] fair ground for the belief that Law is the expression of chance." *Id.,* 339 *U.S.* at 86, 70 *S.Ct.* at 444, 94 *L.Ed.* at 670. "Respect for continuity in law, where reasons for change are wanting," and where the change will produce uncontemplated results and confusion, demand that the court not extend the law as it has today. *Ibid.*

This case, in many ways, is an easy one in which to introduce this type of *voir dire* question because it consisted only of a penalty phase. The intimation of a prior murder conviction during *voir dire* could not adversely influence the guilt/nonguilt determination. However, in the normal case, *voir dire* occurs before the determination of guilt. Unlike a case with an accompanying rape (in which the guilt-phase evidence will es-

tablish that the rape occurred or did not occur regardless of the questions asked during *voir dire* ), evidence of a prior murder conviction is unlikely to emerge in the evidence presented during the guilt phase. By hinting at it during *voir dire,* the inquiry invites wild speculation during the initial segment of the trial. The majority understands that this type of question, logically extended to its reasonable conclusion, most probably will mandate a two-jury system for all capital trials involving the c(4)(a) aggravating factor to ensure that juries' verdicts were not based on or influenced by such non-evidence. *Ante* at 44, 594 *A.*2d at 194. However, the majority cannot simply pull that thread from our capital-sentencing jurisprudence. The momentum created by this decision pushes us inevitably toward a two-jury system in all capital cases, whatever the aggravating factors alleged. What we have rejected explicitly, *see State v. Ramseur, supra,* 106 *N.J.* at 253–54, 524 *A.*2d 188, we should not now adopt implicitly. My fear that the majority's position will cause the "unravel[ing] of much of the capital-sentencing jurisprudence we have painstakingly developed," *supra* at 94, 594 *A.*2d at 223, gains strong support from the majority's problematic return to issues decided in our original examination of the death penalty. See *id.*

The death-qualification process is a difficult one. Could an honest venireperson not answer "yes" when asked if evidence of a prior murder made it more likely that he or she would vote for death or that it would be very hard to find that mitigating evidence outweighed that aggravating factor? Yet, it would be difficult to say fairly that this juror was not "as nearly impartial 'as the lot of humanity will admit,'" *State v. Singletary, supra,* 80 *N.J.* at 62, 402 *A.*2d 203 (quoting *State v. Jackson, supra,* 43 *N.J.* at 158, 203 *A.*2d 1), in a society where there is "substantial unanimity * * * as to the validity of the [prior murder conviction aggravating] factor. Perhaps the majority of decisionmakers in the system, including penalty-phase jurors, believe that this factor, if it exists, ought to be the factual basis for the imposition of a death sentence." L. Bienen, N. Weiner,

D. Denno, P. Allison, and D. Mills, *The Reimposition of Capital Punishment in New Jersey: The Role of Prosecutorial Discretion*, 41 *Rutgers L.Rev.* 27, 247 (1988).

Certainly, the Legislature believed evidence of a prior murder conviction ought to provide the factual basis for the imposition of the death penalty: it made such a finding a statutory aggravating factor militating in favor of a death sentence. Aggravating factors are meant to sway jurors. The death-penalty statute spells out specific aggravating circumstances that one may legitimately rely on when considering the death penalty in a given case. When, without any previous acquaintance with the actual contents of the Capital Punishment Act, a prospective juror believes that evidence of a prior murder conviction would influence, perhaps strongly influence, his or her decision to impose the death penalty, that citizen merely adds unstated support to a society-wide consensus enacted into law by our Legislature. One may agree naturally and unwittingly with most of society, our Legislature, and our courts that a prior murder conviction provides a legitimate basis to support consideration of the death penalty in a given case. Such a shared sentiment, discovered by the court during *voir dire* or realized by a juror during the later trial, does not deprive a defendant of an impartial jury.

I would defer to the trial court's field-tested wisdom.

### B

"*Voir dire* is not an end in itself but merely an effective means to select an impartial jury." *State v. Long,* 119 *N.J.* 439, 479, 575 *A.*2d 435 (1990). I am convinced of the overall thoroughness of this *voir dire.* I am also convinced that the trial court's instructions and the jury's conduct vitiate any fear that this jury was biased or refused to consider evidence on mitigation. Therefore, I believe that this jury was impartial, or at least "as nearly impartial 'as the lot of humanity will admit.'" *State v. Singletary, supra,* 80 *N.J.* at 62, 402 *A.*2d 203 (citation

omitted). Any error resulting from failure to ask the proffered questions was harmless.

Like other cases with technical demerits directed at a *voir dire* where further questioning could have been helpful, *see Mu'Min v. Virginia, supra,* —— *U.S.* at ——, 111 *S.Ct.* at 1904, 114 *L.Ed.*2d at 504, the record here nonetheless assures me that "the overall scope and quality of the *voir dire* was sufficiently thorough and probing to assure the selection of an impartial jury." *State v. Biegenwald, supra,* 106 *N.J.* at 29, 524 *A.*2d 130; *see also State v. Dixon, supra,* 125 *N.J.* at 247, 593 *A.*2d at 278 ("the questioning was sufficiently calculated to produce a fair and unbiased jury"); *State v. Hunt, supra,* 115 *N.J.* at 354, 558 *A.*2d 1259 ("although *voir dire* may not have been perfect in all respects * * *, it was sufficient to enable counsel and the court to evaluate the juror's fitness to serve"); *State v. Zola, supra,* 112 *N.J.* at 397, 548 *A.*2d 1022 (citing *State v. Biegenwald, supra,* 106 *N.J.* at 29, 524 *A.*2d 130). The record also shows that the jury actually selected through this *voir dire* apparently proceeded in an impartial manner, even though they were not asked during *voir dire* how Biegenwald's prior conviction would affect them.

Of course it may have been preferable for the trial court to have allowed the *voir dire* questioning requested by defense counsel with respect to the jurors' attitudes about the "prior murder" factor. See *post* at 105–106, 594 *A.*2d at 229. (Stein, J., dissenting). We have repeatedly emphasized that *Manley* was never intended to freeze *voir dire* into a judicial straitjacket and that it is "appropriate for the court *or for counsel* to have asked additional open-ended questions directed to any specific feelings that the jurors might have had about capital punishment in that case." *State v. Moore, supra,* 122 *N.J.* at 449–50, 585 *A.*2d 864 (emphasis added) (citing *State v. Long, supra,* 119 *N.J.* 439, 575 *A.*2d 435; *Williams* II, *supra,* 113 *N.J.* 393, 550 *A.*2d 1172; and *State v. Zola, supra,* 112 *N.J.* 384, 548 *A.*2d 1022).

However, it does not follow that the discretionary determination by this trial judge fell so far from the mark as to constitute a due process violation or an infringement on fair trial rights. See *post* at 104, 594 *A*.2d at 228 (Stein, J., dissenting) ("the Court's holding attaches undue significance to the question the trial court refused to ask"). I am comforted in that conclusion in this case by the fact that on those few occasions when jurors were asked the question (because they had disclosed their knowledge of the prior murders) the jurors evidenced no unwillingness to consider the mitigating evidence, even in light of the prior murders. For example, prospective juror Russo was asked:

Q But even with another murder in your words, would you still be willing to listen and open to the possibility that the mitigating factors might still outweigh even that?

A Oh, yes, I'd listen, yes.

Q So even with another murder, it's possible, I think, from what you have said, you still could vote for life imprisonment with no parole for at least 30 years?

A Yes.

Q Depending upon what you hear?

A Yes.

And prospective juror McCormack was asked:

Q Is there anything about what you have read about killings, plural, that you believe might affect your judgment in this case where essentially this case is the fact that he has been found guilty of a killing. Now we're going to decide the penalty. Do you think all that background information is going to have an effect on you?

A No.

Q You mean you'll just be able to listen to what you hear in the Court room?

A Yes.

Q And if it's different from what you read in the newspaper you'll forget all about what you read in the newspaper?

A Yes.

Throughout the *voir dire*, all of the jurors who were qualified agreed that they would consider the mitigating evidence proffered by the defendant in evaluating the statutory aggravating factors. This jury was not closed-minded.

The majority states that

> [t]he refusal to permit questioning on the impact of other murder convictions during *voir dire* constitutes serious error. Such error, however, is not irremediable. Defendant's sentence may be upheld if the *voir dire* was otherwise so thorough and probing as to ensure that the jurors empaneled had the "capacity to credit the evidence in mitigation," *State v. Bey*, 112 *N.J.* 123, 154 [548 *A.*2d 887] (1988) (*Bey* II), and the ability to perform their duties in accordance with the court's instructions and their oaths, *see Adams v. Texas, supra,* 448 *U.S.* at 45 [100 *S.Ct.* at 2526] 65 *L.Ed.*2d at 589. [*Ante* at 34–35, 594 *A.*2d at 189.]

In addition to the obvious strengths I found in my review of the overall *voir dire*, and to the comfort I find in the responses of jurors like Russo and McCormack, other evidence demonstrates that the *Bey* II and *Adams* demands were met and any error remedied.

Defendant concedes that some venirepersons, unlike Russo and McCormack, whose understanding of the applicability of the death penalty was flawed and who indicated they would not be able to follow the law were properly excused for cause. *Cf. State v. Dixon, supra,* 125 *N.J.* at 247, 593 *A.*2d at 278 ("Any of those who had preconceived notions of guilt were excused."). Venireperson Piccaci, for example, was excused for his belief that the "only case" in which he would not vote for a death sentence was "negligence * * * something like a hit and run." Prospective juror Tulibacki was excused for his belief that capital punishment was appropriate for all murders except those committed either in anger or accidentally. Venireperson Luzzati was excused because he stated, "if it was cold-blooded murder, I feel that his life should be taken, too," but "[i]f it was an accident, that's something totally different." Those three venirepersons' answers about their death-penalty views were elicited through an initial, general, open-ended question by the trial court, followed by an invitation to the prospective juror to elaborate.

Of the questions defense counsel requested, most were asked by the court. There were approximately six or seven times when the court refused to ask questions requested by defen-- dant. Those refusals followed two related types of requests. First, when a venireperson indicated that he or she would vote

for the death penalty under "certain circumstances," defendant requested an inquiry into what those circumstances were. Closely allied to that request, counsel occasionally sought inquiry into whether the knowledge that defendant had two prior murder convictions would substantially impair the juror's ability impartially to decide defendant's sentence. Unlike *Williams II*, in which the questioning was "woefully inadequate" and "marked by repeated defense objections" and in which defense counsel had exhausted all his peremptory challenges, 113 *N.J.* at 404–05, 550 *A*.2d 1172, here the questioning was adequate, there were few objections by defense counsel, and the defense used only thirteen of its peremptory challenges. *Ante* at 42, 594 *A*.2d at 194. The majority agrees that the *voir dire* with respect to pretrial publicity was adequate.

I also find that the *voir dire* was sufficiently probing to weed out any prospective jurors whose ability to determine defendant's proper sentence was impaired. See *State v. Hunt, supra*, 115 *N.J.* at 351, 558 *A*.2d 1259; *State v. Biegenwald, supra*, 106 *N.J.* at 29, 524 *A*.2d 130. As in *State v. Zola, supra*, 112 *N.J.* at 396, 548 *A*.2d 1022, there were "some areas in which more inquiry would have undoubtedly been of assistance, as in the questioning of some jurors who expressed the view that capital punishment would be appropriate in some cases but not in others." The Court indicated in *Zola*, however, that the critical information to be garnered through *voir dire* is that jurors "be able to follow the law and to weigh the factors prescribed by the capital punishment act." *Ibid.* The *voir dire* in the present case appears to have accomplished that task.

The jurors understood that the trial would provide the appropriate considerations for sentencing, and venirepersons who expressed their inability to conform to the process were excused. That is the aim of a proper and adequate *voir dire*, no more, no less. Those jurors professed to be fair, and we cannot forget their conscientious efforts. People will "inevitably react to what [they] hear as [they] hear it." *State v. LeFera*, 42 *N.J.* 97, 108, 199 *A*.2d 630 (1964). That fact of human nature should

not lead us to assume that they were unequal to their oath to apply the law conscientiously and to find the facts. All those jurors said that they would "leave their prejudices on the courthouse steps and decide [the] case on the merits alone." *Id.* at 110, 199 *A.*2d 630. The record indicates that they did so.

My confidence in the fairness of the outcome receives further support in the court's instructions, instructions that we must assume the jury followed:

> Under your oath you are obligated to accept [the law as I have explained it] and then use those principles in deciding the case.

> \* \* \* \* \* \* \* \*

> If, in your deliberations, you should become confused as to the legal principles that I have defined and explained for you, simply frame a question in writing \* \* \* and after reading it and discussing it with counsel, if necessary, we'll call you back into the jury box and I'll go over it again. We don't want you to decide the case in a state of uncertainty as to what the law is. Any problem with that, let me know.

> \* \* \* It may well be that as you sit there now, each of you has a tentative conclusion in your mind as to how you are going to vote on the aggravating and mitigating factors, and how you intend to vote on the ultimate penalty that you will choose as appropriate to this case.

> \* \* \* \* \* \* \* \*

> What would be wrong is if you were to blindly cling to that tentative conclusion despite persuasive arguments for considerations raised by your fellow jurors during the deliberative process.

The jurors were also told that

> [i]n deliberating on whether one or more of the mitigating factors has been established, you will focus primarily on the testimony of Dr. Eshkenazi [Biegenwald's psychiatrist].

Armed with those instructions, this jury did not behave like a group that had foreclosed consideration of evidence in mitigation. It asked for read-backs of Dr. Eshkenazi's testimony, testimony going directly to the issue of mitigating factors. It did find two aggravating factors present. However, a number of the jurors concluded that two mitigating factors, *N.J.S.A.* 2C:11–3c(5)(d) (impairment by mental disease or defect) and c(5)(h) (the "catchall" factor), also existed. Only after deliberating in this manner did this jury find unanimously and beyond

a reasonable doubt that the aggravating factors outweighed the mitigating ones.

The jurors who were chosen all agreed that they believed the death penalty was appropriate in some instances and not in others, that they could consider and weigh the aggravating and mitigating factors presented at trial and determine the sentence, that they could impose either life or death, that they could listen to and consider psychiatric testimony, and that they could follow the trial court's instruction on the law. See *State v. Dixon, supra,* 125 *N.J.* at 247–248, 593 *A.*2d at 278. In sum, they were a jury that could " 'conscientiously apply the law and find the facts.' " *State v. Koedatich, supra,* 112 *N.J.* at 293, 548 *A.*2d 939 (quoting *Wainwright v. Witt, supra,* 469 *U.S.* at 423, 105 *S.Ct.* at 851, 83 *L.Ed.*2d at 851). The overall thoroughness of the *voir dire* remedied the error, if any, occasioned by failure to expand *voir dire* to include a specific inquiry into the effect defendant's prior murder convictions would have on a venireperson's ability to credit and consider evidence in mitigation.

## IV

### *Other Issues*

I, like the majority, believe the New Jersey Capital Punishment Act is constitutional. *See State v. Ramseur, supra,* 106 *N.J.* at 185–90, 524 *A.*2d 188. I also believe that the majority correctly rejects defendant's claims under *State v. Gerald,* 113 *N.J.* 40, 69, 549 *A.*2d 792 (1988). As in numerous other cases, this record and the record at the guilt/non-guilt phase provide no rational basis on which a jury could conclude that defendant shot this young woman with an intent to cause serious bodily injury rather than death. *See, e.g., State v. McDougald,* 120 *N.J.* 523, 577 *A.*2d 419 (1990); *State v. Rose,* 120 *N.J.* 61, 576 *A.*2d 235 (1990); *State v. Pitts,* 116 *N.J.* 580, 562 *A.*2d 1320 (1989); *State v. Hunt, supra,* 115 *N.J.* 330, 558 *A.*2d 1259.

I also agree with the majority that there was no abuse of discretion in failing to relieve defense counsel or in failing to change venue *sua sponte*. I only wish that the majority would have similarly deferred to the trial court's exercise of discretion during jury-selection. *Ante* at 23, 594 *A*.2d at 183 (noting that "the nature of jury selection inherently requires evaluation of the demeanor of venirepersons, an assessment narrowly circumscribed on appellate review of an unanimated transcript").

Finally, I do not believe that any of the issues not reached by the majority have merit.

## V

### *Conclusion*

Both the jury that initially decides a capital case and the appellate court that inevitably reviews that decision understand the gravity of a decision to impose the death penalty. Appropriately selected and properly educated on the law and the facts of the case, neither views its duty with anything but solemnity, because the decision to impose or to uphold society's ultimate sanction is not undertaken lightly. The record demonstrates that this jury was properly selected for, and educated to, its task. That being the case, and no other ground for reversal being present, my duty is clear. I would affirm the sentence.

O'HERN, J., concurs in this opinion.

STEIN, J., dissenting.

That the Court is presented with the critical issue that arose from the jury *voir dire* is regrettable indeed. During that *voir dire* defense counsel requested the trial court to ask jurors otherwise qualified to sit whether knowledge of defendant's prior murder convictions would impair substantially the ability of those jurors to consider and weigh mitigating factors. The State directed the trial court's attention to our opinion in

*State v. Williams*, 113 *N.J.* 393, 550 *A.*2d 1172 (1988) (*Williams*
II), in which we held that it was error for the trial court not to
have inquired of jurors during that *voir dire* whether they
automatically would vote to impose the death penalty if the
defendant had committed rape and murder, as the indictment
alleged. *Id.* at 417, 550 *A.*2d 1172. As noted by the majority
opinion, the State also submitted a proposed question for the
trial court's use, acknowledging the need for inquiry about
defendant's prior murder convictions. *Ante* at 34, 594 *A.*2d at
189. The trial court declined to follow the Court's analysis in
*Williams* II, independently reasoning that the proposed ques-
tion about defendant's prior murder convictions improperly
intruded on the jury's ultimate responsibility to weigh aggra-
vating and mitigating factors.

The Court now holds that the trial court's failure to submit
that inquiry to prospective jurors was not only error but
reversible error, because the prejudicial effect of the court's
failure to inquire was not overcome by the balance of the *voir
dire*. The Court acknowledges that notwithstanding the trial
court's failure to question jurors about defendant's prior mur-
der convictions, the sentence is sustainable if the *voir dire* was
otherwise sufficiently probing to ensure that the jury possessed
the "capacity to credit the evidence in mitigation," *ante* at 34,
594 *A.*2d at 189 (quoting *State v. Bey*, 112 *N.J.* 123, 154, 548
*A.*2d 887 (1988)), and the ability to follow the court's instruc-
tions. Concluding that the balance of the *voir dire* was not
sufficiently open-ended and thorough to compensate for the
trial court's refusal to interrogate jurors about defendant's
prior murder convictions, the Court reverses defendant's sen-
tence. I read the Court's opinion to hold that the *voir dire*
would not have required reversal but for the trial court's
failure to have questioned jurors about defendant's prior mur-
der convictions. Although I share with the majority the view
that the *voir dire* should have accommodated the joint request
by defense counsel and the State to inquire about defendant's
prior murder convictions, I consider the majority's conclusion

that the *voir dire* was "constitutionally flawed" to overstate substantially the significance of the trial court's omission.

To afford a context within which to explain my disagreement with the majority, I note that except for *Williams* II, *supra*, 113 *N.J.* 393, 550 *A*.2d 1172, the majority opinion relies on no other federal or state court decision to support its holding that the failure to inquire about defendant's prior murder convictions can constitute reversible error if that omission is not redeemed by the balance of the *voir dire*. Nor does it cite any authority for the proposition that the failure.to inquire about jurors' attitudes toward any comparable aggravating factor could constitute reversible error. My research has uncovered no such authority. I therefore conclude that the majority's holding, applying the right to a fair and impartial jury guaranteed under both the federal and the state constitutions, *U.S. Const.* amends. VI and XIV; *N.J. Const.* art. I, ¶ 10, is one of first impression.

The Court's holding is also unique when viewed in the context of the developed jurisprudence on capital-murder juror disqualification, which has invariably focused on the disqualification of jurors scrupled *against* the death-penalty, so-called *Witherspoon* excludables. *See Wainwright v. Witt*, 469 *U.S.* 412, 105 *S.Ct.* 844, 83 *L.Ed.*2d 841 (1985); *Adams v. Texas*, 448 *U.S.* 38, 100 *S.Ct.* 2521, 65 *L.Ed.*2d 581 (1980); *Witherspoon v. Illinois*, 391 *U.S.* 510, 88 *S.Ct.* 1770, 20 *L.Ed.*2d 776 (1968). In *Witherspoon*, the Court held that jurors inclined against imposition of the death penalty could be excluded for cause only if they

made unmistakably clear (1) that they would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, or (2) that their attitude toward the death penalty would prevent them from making an impartial decision.as to the defendant's *guilt*. [391 *U.S.* at 522 n. 21, 88 *S.Ct.* at 1777 n. 21, 20 *L.Ed.*2d at 785 n. 21).]

The *Witherspoon* standard was modified in *Adams v. Texas*, *supra*, 448 *U.S.* 38, 100 *S.Ct.* 2521, 65 *L.Ed.*2d 581, and *Wainwright v. Witt*, *supra*, 469 *U.S.* 412, 105 *S.Ct.* 844, 83 *L.Ed.*2d 841, both cases involving exclusion of jurors disinclined to

impose the death penalty. In *Adams* the Court held that such a juror was excludable for cause only if "his views about capital punishment * * * would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." 448 *U.S.* at 45, 100 *S.Ct.* at 2526, 65 *L.Ed.*2d at 589. In *State v. Ramseur*, 106 *N.J.* 123, 256, 524 *A.*2d 188 (1987), we held that trial courts should apply the *Adams–Witt* standard in death-qualifying a jury, and in *State v. Bey, supra*, 112 *N.J.* at 152, 548 *A.*2d 887, we acknowledged that that standard applied to jurors who invariably favor the death penalty as well as to those who oppose it.

Nevertheless, there is a distinct lack of precedent in state and federal decisions relating to disqualification of jurors who favor capital punishment for any defendant convicted of murder. Presumably, the issue is not often preserved for appeal because the automatic death-penalty juror is challenged either for cause or peremptorily. When the issue is presented on appeal, courts generally acknowledge that under the *Adams–Witt* standard a juror who would vote to impose the death sentence automatically on a defendant convicted of murder should be excused for cause. *See, e.g., Ross v. Oklahoma*, 487 *U.S.* 81, 84–85, 108 *S.Ct.* 2273, 2276–77, 101 *L.Ed.*2d 80, 87–88 (1988); *accord Hance v. Zant*, 696 *F.*2d 940, 956 (11th Cir.1983); *Hovey v. Superior Court*, 28 *Cal.*3d 1, 20 n. 48, 616 *P.*2d 1301, 1310 n. 48, 168 *Cal.Rptr.* 128, 137 n. 48 (1980).

However, the Court writes on a clean slate when it applies the *Adams–Witt* standard to require that jurors who would not vote automatically to impose the death sentence on all convicted murderers must necessarily be interrogated on whether they would so vote if the defendant had prior murder convictions. The Court apparently assumes that a juror unable to verify his or her willingness to weigh mitigating factors against the prior-murder-conviction aggravating factor is necessarily excludable for cause. That assumption ignores a caution expressed in *Wainwright v. Witt, supra*, 469 *U.S.* 412, 105 *S.Ct.* 844, 83 *L.Ed.*2d 841, although stated in a different context:

[D]eterminations of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism. What common sense should have realized experience has proved: many veniremen simply cannot be asked enough questions to reach the point where their bias has been made "unmistakably clear"; these veniremen may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings. [469 *U.S.* at 424–25, 105 *S.Ct.* at 852–53, 83 *L.Ed.*2d at 852.]

The Court's holding also ignores the most recent United States Supreme Court decision on jury *voir dire, Mu'Min v. Virginia,* —— *U.S.* ——, 111 *S.Ct.* 1899, 114 *L.Ed.*2d 493 (1991), in which the Court determined that the Constitution did not mandate that jurors in a murder prosecution *be questioned about the content of pretrial publicity to which they had been exposed,* even though eight of the twelve sitting jurors acknowledged familiarity with some pretrial publicity. Emphasizing that the trial court "retains great latitude in deciding what questions should be asked on voir dire," *id.* at ——, 111 *S.Ct.* at 1904, the Court stated:

"Despite its importance, the adequacy of voir dire is not easily subject to appellate review. The trial judge's function at this point in the trial is not unlike that of the jurors later on in the trial. Both must reach conclusions as to impartiality and credibility by relying on their own evaluations of demeanor evidence and of responses to questions." [*Ibid.* (quoting *Rosales–Lopez v. United States,* 451 *U.S.* 182, 188, 101 *S.Ct.* 1629, 1634, 68 *L.Ed.*2d 22, 28 (1981)).]

I cite *Mu'Min* not for the force of its analysis but rather to emphasize the gap between the majority's holding and the Supreme Court's insistence that the Constitution does not ordinarily require that jury *voir dire* in criminal cases include specific lines of interrogation.

In my view, the Court's holding attaches undue significance to the question that the trial court refused to ask. I reach that conclusion not because of any doubt that some jurors would react strongly and emotionally to information that defendant had two prior murder convictions, but because such a reaction is almost inevitable and virtually inherent in the Legislature's designation of a prior murder conviction as an aggravating factor. Jurors informed of a defendant's prior murder convic-

tions would naturally be influenced in the direction of favoring imposition of the death sentence. Whether a juror would be moved so far as not only to override, but also to preclude, any consideration of mitigating factors is an aspect of the weight to be attached by that juror to the prior murder convictions. To that extent, the trial court correctly observed that inquiry about defendant's prior murder convictions would intrude to some degree on the weighing process to be conducted during the sentencing phase.

The majority's holding also overrates the significance of a juror's response to a question about prior murder convictions. We have learned from extensive review of jury *voir dire* in capital cases that most jurors have not reflected seriously about their precise views on capital punishment. Even open-ended questions about the death penalty during *voir dire* generate confusing and contradictory responses. An obvious impediment to an informative *voir dire* is the built-in time constraint, jurors being required to respond almost immediately to profound questions with religious and philosophical ramifications. Rare is the juror who is able to answer questions about the death penalty coherently, thoughtfully, and responsively. The question whether knowledge of defendant's two prior murder convictions would impair a juror's ability fairly to weigh evidence of mitigating factors against that aggravating factor is extraordinarily difficult and subtle. The reliability of the juror's response may depend on the way the question is phrased, the judge's tone and demeanor, and whether the juror adequately understands the complexity of the inquiry. Perhaps the best reason for asking the question is that the response may assist counsel in the exercise of peremptory challenges. In my view, however, the majority has attached too much significance to the prospect that the question and its answer reliably will identify jurors who are excludable for cause.

Another reason not to attach undue significance to the trial court's failure to ask jurors whether defendant's prior murder convictions would impede their ability to weigh mitigating

factors is that the question is too abstract. If the response is to be informative, the jurors would seemingly need to be informed about the evidence of mitigating factors against which the prior-murder-conviction aggravating factor is expected to be weighed. In my view they should be so informed, but defendant's request to the trial court apparently did not contemplate that the inquiry would be made in the context of the anticipated evidence of mitigation. Thus, the responses that the proffered question would have elicited are less significant in the context of the overall *voir dire* because they would not have reflected the thoughtful view of jurors informed of evidence of both aggravating and mitigating factors.

The Court's opinion is troublesome for another reason. The Capital Punishment Act sets forth eight aggravating factors, *N.J.S.A.* 2C:11–3c(4)(a) to (h), all of which have the capacity, either individually or in combination with other aggravating factors, to influence a juror to vote for the death penalty to the extent of precluding that juror's consideration of mitigating evidence. Murder of a public servant ((c)(4)(h)), murder committed for money ((c)(4)(d)), or murder involving depravity of mind ((c)(4)(c)), are examples of the more inflammatory aggravating factors. In this case the State offered evidence of depravity consisting of testimony that defendant murdered the victim for no reason other than his desire to kill. During the last day of *voir dire* defense counsel vaguely suggested that the trial court should question jurors whether evidence of the depravity aggravating factor would impair their ability to consider and weigh mitigating evidence, which the trial court summarily rejected. But the Court does not address whether that ruling was error, nor does it offer necessary guidance to trial courts on the aggravating factors about which jurors must be interrogated. The implications of the Court's ruling in respect of other aggravating factors is an added basis for misgivings about the majority's holding.

I do not share the majority's view that this *voir dire* was constitutionally flawed. As is typical of jury *voir dire* in other

capital cases, this *voir dire* had its ups and downs, including both instances of patient, open-ended inquiry and occasions on which the trial court's questions hinted at a desired response. The trial court, nonetheless, consistently excused prospective jurors who indicated even the slightest suggestion of a predisposition to sentence defendant to death, including all jurors who expressed the possibility of prejudice because the victim was a young woman. On the whole, this *voir dire* in my view reflected a thoughtful and conscientious effort by the trial court to select a fair and impartial jury, with little objection having been asserted by defense counsel. The *voir dire* in this case simply cannot be compared with the inadequate *voir dire* that was the basis for our reversal in *Williams* II, *supra,* 113 *N.J.* 393, 550 *A.*2d 1172.

Because *voir dire* is an art and not a science, I believe the Court is unwise in attempting to freeze-frame part of the script for a constitutionally acceptable *voir dire* in capital cases. Bright-line rules for the conduct of *voir dire* are inherently suspect because they generate the need for more rules and exceptions to rules. In reviewing capital-case *voir dire,* we should be guided not by scripts or formulas but by the fundamental question whether the jury empaneled was fair and impartial, a standard I am convinced was satisfied in this case. I would affirm defendant's sentence.

*For Vacation and Remandment*—Chief Justice WILENTZ, and Justices CLIFFORD, HANDLER and POLLOCK—4.

*For Affirmance*—Justices O'HERN, GARIBALDI and STEIN—3.